**Robert CLEM, Plaintiff,**

v.

**COUNTY OF FAIRFAX, VIRGINIA, et al., Defendants.**

**No. CIV. A. 00–1684–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

July 17, 2001.

Brien Anthony Roche, Johnson & Roche, McLean, VA, for plaintiff.

Cynthia L. Tianti, Assist. County Atty., Fairfax, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This action is a Section 1983 [1] excessive use of force, gross negligence, and assault and battery suit brought by plaintiff Robert Clem, a 58–year–old male who suffers from depression and dementia, against defendants County of Fairfax, the County's Chief of Police, and two individual officers, Shannon Corbeau and Eric Nelson. Following a hearing, summary judgment was entered in favor of all defendants, except Officer Corbeau.[2] Cross-motions for summary judgment relating to Officer Corbeau were denied on the ground that triable

---

**1.** 42 U.S.C. § 1983.

**2.** *See Clem v. County of Fairfax,* Civ. A. No. 00–1684–A (E.D.Va. May 29, 2001) (Order finding that no triable issues of fact remain as

to whether Officer Nelson used excessive force and whether the remaining defendants were deliberately indifferent to plaintiff's constitutional rights).

issues of fact remained with respect to whether Officer Corbeau is entitled to qualified immunity for his actions in shooting plaintiff three times.[3] Plaintiff subsequently filed a motion to alter or amend this ruling. This Memorandum Opinion sets forth the reasons for the denial of summary judgment for Officer Corbeau on qualified immunity grounds and also resolves plaintiff's motion to alter or amend.

## I.

On November 9, 1998, plaintiff's wife called 911 and advised the dispatcher that plaintiff, who had mental problems, had not eaten in three days, was refusing to go to his doctor's appointment, was urinating on the floor, and was dropping lighted cigarettes on the floor. The dispatcher labeled the call a "mental case," and Officers Corbeau and Nelson responded. Before entering plaintiff's residence, Officer Nelson informed Officer Corbeau that approximately six weeks earlier, Officer Nelson and another officer had responded to a similar call from plaintiff's wife, who complained that plaintiff had threatened her with a knife. On this earlier occasion, the officers were able to persuade plaintiff to attend his scheduled doctor's appointment.

When the officers entered the residence, plaintiff was seated at the kitchen table. Officer Corbeau testified that plaintiff appeared "slightly out of it." Once inside, Officer Nelson attempted to persuade plaintiff to keep his doctor's appointment. These efforts, at least initially, were successful, as plaintiff stated that he was willing to keep the appointment. Accordingly, Officer Nelson assumed the situation was under control, and called off the units en route to provide back-up support.

Then, the situation changed abruptly. Plaintiff changed his mind about keeping his doctor's appointment. In response, both officers renewed their efforts to encourage plaintiff to see his doctor. Officer Corbeau testified that plaintiff responded by stating he would kill Officer Corbeau and while patting his front right pants pocket, plaintiff further declared that he had "something that could beat anything that [Corbeau] had on his belt." Plaintiff's nephew, who was present at the time, disputed Officer Corbeau on this point. He stated, instead, that plaintiff never threatened the officers, but did pat his pocket and state that "you think that I am afraid of you because of your badge." Mrs. Clem also disputed Officer Corbeau's testimony on this point; she agreed with the nephew's account that plaintiff never threatened either Officer Corbeau or Officer Nelson. Officer Nelson supported Officer Corbeau's testimony, although his support is arguably contradicted by the first statement he provided in the course of an interview on the date of the shooting. In that interview, Officer Nelson never mentioned that plaintiff had patted his pocket or threatened defendant. Later that day, however, Officer Nelson did confirm Officer Corbeau's version of plaintiff's statement. Yet, significantly, during this same interview, Officer Nelson also stated that he was certain that plaintiff was unarmed, despite plaintiff's threat, because plaintiff's shirt was open and he could see that plaintiff had no weapons in his front pocket or tucked into his waistband.

Immediately following the disputed statement, plaintiff, with no warning, jumped out of his seat and with his arms up in the air began moving toward Officer

---

**3.** Summary judgment was granted in favor of Officer Corbeau on his liability for using pepper spray against plaintiff. *See Clem v. County of Fairfax,* Civ. A. No. 00–1684–A (E.D.Va. May 29, 2001) (Order).

Corbeau. Plaintiff's wife and Officer Nelson attempted unsuccessfully to restrain him. Officer Corbeau, in response, used his pepper spray on plaintiff because he felt that plaintiff "posed an immediate threat of serious bodily injury."[4] As it happened, the pepper spray also struck Officer Nelson, plaintiff's wife, and plaintiff's nephew. Because it appeared that the pepper spray had momentarily stopped the plaintiff, Officer Nelson directed plaintiff's nephew to escort plaintiff's wife to the bathroom to wash her face, and Officer Nelson then went to the front door to radio for additional support.

After being sprayed with pepper spray in the breakfast area by Corbeau, plaintiff entered the living room area where Officer Corbeau was located. When Officer Nelson returned from his radio call, plaintiff began moving toward him. Officer Nelson stated that plaintiff used profanity and swung his arms "like he [was] reaching out to punch [me]." Officer Nelson pulled out

his pepper spray and repeatedly warned plaintiff to keep his distance. According to Officer Nelson, these warnings went unheeded and although he backed away from plaintiff, plaintiff attempted to strike Officer Nelson.[5] Officer Nelson deflected the attempt and then used his pepper spray on plaintiff.[6]

Following this, plaintiff began moving toward Officer Corbeau, who retreated by moving into a hallway that connected to the living room. Officer Corbeau described plaintiff's movement toward him as extremely fast, his countenance as snarling, his eyes as bulging out, and plaintiff as showing no apparent reaction to the pepper spray. Officer Corbeau also stated that plaintiff's arms were flailing about and that he swore that he was going to kill Officer Corbeau. Officer Nelson corroborated Officer Corbeau's description of plaintiff's movement and threats.[7] As plaintiff continued to approach at Officer Corbeau, Officer Corbeau repeated his

---

4. Two factual disputes emerged regarding Officer Corbeau's use of pepper spray: (i) whether plaintiff was attempting to strike Officer Corbeau and (ii) the speed at which plaintiff moved toward him. As to the former, Officer Corbeau testified that he felt that plaintiff was threatening him and was seeking to strike him. Officer Nelson stated that plaintiff's arms were above his head, but they were not in a swinging motion. As to plaintiff's speed, Nelson described plaintiff as charging at Officer Corbeau, but also used the words 'pounding steps' or 'robotic movement' to describe plaintiff's movement, suggesting that the movement was slower. Plaintiff's wife offered a conflicting rendition, contending instead that plaintiff simply stood up. Given that the distance between plaintiff and Officer Corbeau was approximately 3–4 feet, plaintiff argues that if he charged Officer Corbeau, he would have made contact with him. In any event, these disputes are not directly material to the issue at bar. Also, Officer Corbeau has already been accorded qualified immunity as to his use of pepper spray on plaintiff. *See supra* note 3.

5. Officer Corbeau described plaintiff's actions differently. Instead of an attempted punch, Officer Corbeau described a scene in which plaintiff was waiving his arms in the air and in doing so brushed Officer Nelson's arm.

6. Officer Nelson, like Officer Corbeau, was accorded qualified immunity for his use of pepper spray on plaintiff.

7. Plaintiff contends that the record supports an inference that he was walking, not charging, toward Officer Corbeau. This is so because plaintiff's wife and nephew, who were not then in a position to see plaintiff, asserted nonetheless that plaintiff had ambulatory problems that limited his ability to walk quickly. Furthermore, plaintiff's wife testified that she could hear that plaintiff was having breathing difficulties, and therefore could not have been moving quickly. In addition, plaintiff points to Officer Nelson's descriptions of plaintiff's movements as "robotic," not rapid.

warnings to plaintiff to stop advancing.[8] By this time, Officer Corbeau retreated approximately four feet down the approximately fifteen-foot hallway, unholstered his gun, and shot plaintiff three times, once in the groin and twice in the torso area. Officer Corbeau stated that he was forced to shoot from the hip because plaintiff's proximity prevented him from extending his arm. After being shot, plaintiff took a few steps away from Officer Corbeau and fell onto his side.

On September 1, 2000, plaintiff filed a three-count complaint against in the Fairfax County Circuit Court. Count I alleges that defendants violated plaintiff's federal constitutional rights as guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments. Counts II and III are Virginia state law claims for gross negligence and assault and battery, respectively. On October 11, 2000, defendants removed the case to federal court. Then, on April 13, 2001, plaintiff filed a motion for partial summary judgment, and each defendant responded by filing a cross-motion for summary judgment. After briefing and oral argument, summary judgment was granted in favor of Officer Nelson, Chief Manager, and the County of Fairfax on all counts. *See Clem v. County of Fairfax,* Civ. A. No. 00–1684–A (E.D.Va. May 29, 2001) (Order). Summary judgment was granted in favor of Officer Corbeau on the excessive force claim relating to his use of pepper spray, but was denied in all other respects. *See id.* At issue here is whether Officer Corbeau is entitled to qualified immunity with respect to the cause of action in Count I, which alleges that the use of deadly force in the circumstances was a violation of plaintiff's Fourth Amendment rights.

## II.

Government officials are entitled to qualified immunity for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[9] More specifically, "[a] police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful."[10] And, where a defendant seeks qualified immunity, "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. ——, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

Qualified immunity applies only in the context of a validly alleged constitu-

---

8. Plaintiff attempts to create a dispute about whether Officer Corbeau warned plaintiff to stop charging. In an affidavit, plaintiff's nephew contends that Officer Corbeau did not make any further statements to plaintiff. Yet, in his statements to police investigators immediately after the incident, he stated that Officer Corbeau called plaintiff's name and told him to stop. Plaintiff cannot now use an affidavit that contradicts a prior statement to create a dispute of fact. *See Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 975–76 (4th Cir.1990) (where summary judgment record contains affidavit which contradicts prior statements by affiant, affidavit may be disregarded).

9. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982);

10. *Slattery v. Rizzo,* 939 F.2d 213, 216 (4th Cir.1991) (quoting *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)); *see also McLenagan v. Karnes,* 27 F.3d 1002, 1007 (4th Cir.1994) (stating that regardless of whether probable cause actually existed, an officer is entitled to qualified immunity if he "could have ... believed that his conduct was lawful"); *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992).

tional violation. Without such a violation, qualified immunity is obviously unnecessary; in that event, the underlying claim would simply fail. *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Thus, the threshold question that must be addressed before engaging in the qualified immunity analysis is whether the facts alleged, taken in the light most favorable to the plaintiff, establish that the officer's conduct violated a constitutional right. *See Saucier,* 121 S.Ct. at 2156; *Siegert,* 500 U.S. at 232, 111 S.Ct. 1789. This question is easily answered here in the affirmative, given plaintiff's allegation that Officer Corbeau violated his Fourth Amendment right to be free from the use of deadly force unless the "officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others."[11] Specifically, plaintiff argues that Officer Corbeau shot him (three times) under circumstances that did not warrant or justify the use of deadly force. In this regard, plaintiff alleges that he was unarmed, that he posed no threat of serious bodily injury to Officer Corbeau or others, and finally, that Officer Corbeau could not and did not perceive that plaintiff posed such a risk. These allegations, taken in the light most favorable to plaintiff, state a valid claim for excessive use of police force in violation of the Fourth Amendment. Given that plaintiff has alleged a valid Fourth Amendment excessive use of deadly force claim against Officer Corbeau, it remains to be seen whether, on the basis of the developed factual record, Officer Corbeau is entitled to qualified immunity.

▮ Because qualified immunity turns on whether the officer's conduct violates a clearly defined constitutional right of which a reasonable officer would have known, the next step in the analysis is to define the constitutional right involved "at the appropriate level of specificity."[12] Once this is done, the qualified immunity analysis proceeds to ascertain whether the right so defined was clearly established at the time of the incident. If the right was not clearly established in the law at the time, no further inquiry is necessary, as qualified immunity is warranted under these circumstances. *See Saucier,* 121 S.Ct. at 2157. But, if the right infringed was clearly established, a final inquiry is necessary to complete the analysis. This final inquiry asks the fact-specific question whether a reasonable officer could have believed, in the circumstances, that his behavior was lawful.

▮ There is no doubt that the right at issue here—the right to be free from the use of deadly force absent a belief by the officer that the suspect poses a threat of serious physical harm—has long been clearly established.[13] So, then, the final question to address is whether it would have been clear to a reasonable officer that Officer Corbeau's use of deadly force "was unlawful in the situation he confronted."[14]

---

11. *Garner,* 471 U.S. at 11, 105 S.Ct. 1694; *see also Elliott v. Leavitt,* 99 F.3d 640, 642–43 (4th Cir.1996); *Foote v. Dunagan,* 33 F.3d 445 (4th Cir.1994); *McLenagan,* 27 F.3d at 1007; *Rizzo,* 939 F.2d at 216.

12. *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (noting that the dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted).

13. For cases establishing the standard for excessive use of deadly force prior to 1998, the date of the incident in question, see *supra* note 11.

14. *Saucier,* 121 S.Ct. at 2157 (citing *Wilson,* 526 U.S. at 615, 119 S.Ct. 1692); *see Gould v. Davis,* 165 F.3d 265, 269–73 (4th Cir.1998); *Vathekan v. Prince George's County,* 154 F.3d 173, 179–80 (4th Cir.1998).

To answer this final question, it is necessary to canvass the factual record for what it discloses about what Officer Corbeau knew and perceived at the time, for these are the predicate facts for determining how a reasonable officer would respond in the circumstances at bar. In the context of this case, the final question in the qualified immunity analysis is whether or not it would have been clear to a reasonable officer standing in Officer Corbeau's shoes at the time of the shooting that plaintiff posed a risk of serious physical harm to Officer Corbeau or others. If the undisputed factual record discloses that it would have been clear to a reasonable officer that plaintiff posed such a threat, then Officer Corbeau is entitled to qualified immunity.[15] On the other hand, if the undisputed record discloses that the opposite would have been clear to a reasonable officer—namely, that plaintiff did not pose such a risk—then Officer Corbeau's claim of qualified immunity would fail. Of course, if the record reflected that the facts concerning what Officer Corbeau knew and perceived are disputed, a final determination on qualified immunity cannot be made, for as the Fourth Circuit recognized, the issue of qualified immunity is "ripe for summary judgment" only "[i]n the absence of a genuine dispute as to the reasonableness of the officers' perceptions."[16]

---

15. *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir.1994) is illustrative of these circumstances. There, an officer shot an unarmed handcuffed subject who was running towards him because another officer yelled "the man has a gun." The officer who shouted the warning was referring not to the suspect running towards the officer, but to another individual. Qualified immunity was appropriate in that case because there was no dispute that the officer reasonably perceived that the individual he shot was armed. *See id.* at 1007–08. In another Fourth Circuit case, *Slattery v. Rizzo*, an officer shot an unarmed suspect who was seated in an automobile. The Fourth Circuit found that the officer's belief that the suspect posed a serious threat was reasonable in light of the fact that (i) the suspect ignored repeated requests for him to raise his hands, (ii) the officer could not clearly see the suspect's left hand but could tell that his hand appeared to be partially closed around an object, and (iii) the suspect turned his body towards the officer giving the belief that he was going to attack him with a weapon. Again, just as in *McLenagan*, the Fourth Circuit granted qualified immunity because the officer's belief that the suspect was armed and thus threatened his life was reasonable. *See Rizzo*, 939 F.2d at 215; *see also Gooden v. Howard County, Maryland*, 954 F.2d 960, 965 (4th Cir.1992) (en banc) ("Though there is lively debate as to the actual origin of the screams ..., there is little dispute here about what the officers perceived."). In sum, while courts should strive to resolve the question of qualified immunity "at the earliest possible stage in litigation," see *Saucier*, 121 S.Ct. at 2156 (citing *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)), that stage has not yet arrived in a case where there is a genuine dispute regarding the officer's perception.

16. *Gooden*, 954 F.2d at 965–66. A dispute about the officer's perception must be distinguished from a dispute about the amount of force actually used or whether the amount of force used was reasonable. While the former dispute precludes summary judgment, the latter does not. *See, e.g., Saucier*, 121 S.Ct. at 2157–58 (rejecting denial of summary judgment "*any*" time a material issue of fact remains on the excessive force claim") (emphasis added). In *Saucier*, the Supreme Court granted qualified immunity based on the undisputed nature of the officers' perceptions, despite a dispute about the type of force actually used and whether it was reasonable. If there is no dispute about what the officer on-the-scene perceived, courts can determine whether the amount of force employed was reasonable. *See id.* (noting that "[a] reasonable officer ... could have believed that hurrying respondent away from the scene, where the Vice President was speaking and [when] respondent had just approached the fence designed to separate the public from the speakers, was within the bounds of appropriate police response" and that the actions were reasonable because the officers did not know the "full extent of the threat respondent posed or how many others persons there might be

■ A close review of the current record compels the conclusion that neither summary judgment nor qualified immunity can be determined at this time because there remain disputes regarding what Officer Corbeau actually perceived and the reasonableness of his conclusion either that plaintiff was armed or that he posed a threat of death or serious physical injury. Specifically, the following two facts remain in dispute: (i) whether plaintiff made a statement in the kitchen that he had "something that could beat anything that [Corbeau] had on his belt" and (ii) whether at the time of the shooting Officer Corbeau actually and reasonably believed that plaintiff was armed. Both of these disputed issues are plainly material. The disputed statement by plaintiff in the kitchen is central to the reasonableness of Officer Corbeau's claim of concern that plaintiff posed an immediate risk of serious physical injury to himself or others. If Officer Corbeau's version of plaintiff's statement is accepted, then Officer Corbeau might be entitled to qualified immunity. Quite clearly, if plaintiff had a gun in his possession, or if it was reasonable to assume that he was armed at the time of the shooting, qualified immunity would be appropriate. This is so because the "Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." [17]

On the other hand, if the version of plaintiff's statement offered by plaintiff's wife and nephew is credited, then Officer Corbeau could not reasonably have thought plaintiff was armed. In that event, Officer Corbeau would not be entitled to qualified immunity for the use of deadly force, because he could not reasonably have believed that plaintiff posed an immediate risk of serious physical harm to himself or others. Plainly, police officers cannot use deadly force against a mentally ill person who is neither armed nor reasonably perceived to be armed, and who has committed no crime, merely because of a fear that the person might take the officer's weapon. See Garner, 471 U.S. at 11–12, 105 S.Ct. 1694 (defining threat of serious bodily injury).[18] Police officers, who routinely face challenging and life-threatening situations, are not privileged to use deadly force based on no more than this fear. Instead, retreat and/or a lesser degree of force would be warranted in those circumstances, especially where, as here, Officer Corbeau had observed the ease with which Officer Nelson parried plaintiff's advance. It is, of course, inescapable that in analyzing the reasonableness of Officer Corbeau's decision to shoot plaintiff three times, the Court must engage in some amount of "20–20 hindsight," concerning the degree of force employed. Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); see Rowland v. Perry, 41 F.3d 167, 173 (4th Cir.1994). But, while "[d]etached reflection cannot be demanded in the presence

who ... posed a threat to the security of the Vice President"); see also Harlow v. Fitzgerald, 457 U.S. 800, 821, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (Brennan, J. concurring) ("[I]t seems inescapable to me that some measure of discovery may sometimes be required to determine exactly what a public-official defendant did know at the time of his actions.") (internal quotations omitted).

17. Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir.1996); see also Foote v. Dunagan, 33 F.3d 445, 450 n. 4 (4th Cir.1994) (noting that al-

though officer could see both of the suspect's hands, this fact "hardly diminished any concern that he might reach for a concealed weapon").

18. As noted, Officer Corbeau initially stated that this fear was the justification for his conduct. He argued this fear was reasonable because he perceived plaintiff to be approximately 6' to 6'2" tall and weighing approximately 300 pounds.

of an uplifted knife," [19] not only reflection, but a response of lesser force should be expected where there is no knife and no reasonable fear of serious bodily injury.[20]

Moreover, it is disputed whether Officer Corbeau even believed, at the time of the incident, that plaintiff was armed. In his statements immediately after the incident, Officer Corbeau initially stated that the cause of the shooting was not a concern that plaintiff was armed, but rather his fear that plaintiff would be able to take his gun away from him. It was not until a later deposition that Officer Corbeau argued that the shooting was justified because he feared plaintiff might have a weapon. In addition to these inconsistent statements, the veracity of Officer Corbeau's latter statement is questionable in light of the fact that the actions of the officers, up until the moment of the shooting, were inconsistent with a belief that plaintiff was armed. Specifically, neither Officer Corbeau nor Officer Nelson attempted to restrain plaintiff after the first use of pepper spray in the kitchen. In addition, Officer Corbeau stood by and watched when plaintiff began charging at Officer Nelson in the living room—conduct that flatly contradicts a belief that plaintiff was armed. It seems more likely that, had Officer Corbeau genuinely believed plaintiff was armed, he would have drawn his weapon or taken other action to protect Officer Nelson from an armed attack. In short, the record reflects a genuine dispute concerning Officer Corbeau's actual belief at the time of the shooting.

### III.

Accordingly, the parties' cross-motions for summary judgment must be denied, and for these same reasons, plaintiff's motion to alter or amend must also be denied. This result reflects the clear principle that the qualified immunity doctrine's important purpose of saving officers from the burden and expense of litigation in appropriate circumstances does not trump the parties' right to have a fact-finder resolve disputed issues of fact material to the doctrine's application.

An appropriate Order has issued as to summary judgment, and an appropriate order will issue as to plaintiff's motion to alter or amend.

19. *Brown v. United States,* 256 U.S. 335, 343, 41 S.Ct. 501, 65 L.Ed. 961 (1921).

20. Once it is decided that an officer has no reasonable apprehension of immediate serious physical harm or death, the Fourth Amendment excessive force question becomes what degree of force is reasonable in the circumstances. *See Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865.