Robert **CLEM**, Plaintiff–Appellee,

v.

S. **CORBEAU**, Defendant–Appellant,

and

**County of Fairfax, Virginia; J. Thomas Manger, individually and as chief of Police of Fairfax County; E. Nelson, individually and as Police Officer of Fairfax County, VA, Defendants.**

No. 01–1799.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 24, 2002.

Decided March 25, 2002.

**ARGUED:** Cynthia Lee Tianti, Assistant County Attorney, Fairfax, Virginia, for Appellant. Brien Anthony Roche, Johnson & Roche, McLean, Virginia, for Appellee. **ON BRIEF:** David P. Bobzien, County Attorney, Robert Lyndon Howell, Deputy County Attorney, Fairfax, Virginia, for Appellant.

Before MOTZ, KING, and GREGORY, Circuit Judges.

Affirmed in part and dismissed in part by published opinion. Judge MOTZ wrote the opinion, in which Judge KING and Judge GREGORY joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge.

This appeal arises from a telephone call that Aster Clem made from her Fairfax County, Virginia home to the local police department, asking for help with her 58 year old husband, who suffers from dementia, depression, and various physical problems. Mrs. Clem told the police dis-

patcher that Mr. Clem had stopped taking the medication prescribed for his mental illnesses and that his condition was poor: he had been urinating on himself and the floor, dropping lit cigarettes on the carpet, not eating for three days, and refusing to see his doctor, move, or "do anything." Officers Shannon Corbeau and Eric Nelson responded to the dispatch call, arriving simultaneously at the Clems' home. Within a short time after their arrival each officer had subjected Mr. Clem to pepper spray, and Officer Corbeau had shot Mr. Clem three times, severely injuring him; neither officer suffered any injury.

Subsequently, Mr. Clem filed this action, alleging that the individual officers had used excessive force in violation of his constitutional rights and state tort law, and that Fairfax County and its police chief had failed to provide the officers with adequate training and supervision. The district court granted summary judgment to the County, the police chief, and Officer Nelson on all claims, but denied summary judgment to Officer Corbeau on one excessive force claim and the state law claims. We affirm in part and dismiss in part.

## I.

Aside from the skeletal account set forth above, the parties sharply disagree about virtually all relevant facts. The following summary generally sets forth the facts in the light most favorable to the non-moving party, here Mr. Clem. *See Winfield v. Bass,* 106 F.3d 525, 534 (4th Cir.1997) (noting that an appellate court must consider "the actual evidence presented viewed in the light most favorable to the nonmoving party" when, as here, the appealing official asserts that the district court ignored undisputed material facts dictating entitlement to qualified immunity). However, we have also included some facts that Clem

disputes in order to provide a better understanding of the controversy.

After the dispatcher received Mrs. Clem's call on November 9, 1998, he issued a message asking patrol officers near the Clem home to render assistance, characterizing the call as a "mental." Officers Corbeau and Nelson arrived at the Clems' small split-level home simultaneously. They were met at the front door by Paulos Yacob, a nephew who was there to assist in persuading Mr. Clem to see his doctor. Yacob gave the officers further information about Mr. Clem's condition and led them upstairs to the small breakfast nook where the Clems were sitting.

It was apparent to both officers that Mr. Clem was mentally ill, and, in Officer Corbeau's words, "out of it." (Mr. Clem has no memory of what took place during the police response; the account that follows depends on the testimony of other witnesses and on available physical evidence.) The officers recall that Mr. Clem's appearance was "unkempt," and that he sat at the breakfast table smoking, with his head down, staring blankly at the floor. At one point a cigarette dropped from Clem's fingers onto the carpet, where he let it lie until it was stamped out by Officer Nelson. Both officers testified that they observed no bulges in Clem's pockets or waistline nor anything in his open shirt indicating the presence of a weapon. In short, Clem was neither responsive nor threatening but, in Officer Corbeau's words, "real calm."

The officers began talking with Mrs. Clem and Yacob, and after a few minutes were able to attract Mr. Clem's attention. At first Mr. Clem seemed open to persuasion and agreed to go see his doctor. Judging that the situation was under control, Officer Nelson radioed the dispatcher "to say no other units are needed." As Mr. Clem kept talking, however, he appar-

ently began to change his mind. He may also have become confused—the officers remember him making incoherent or non-responsive statements. He complained that his chest was hurting, and that the doctors would not be able to help him. Shortly, Mr. Clem became agitated.

Officer Corbeau maintains that Clem patted his pocket and threatened Corbeau, saying "I got something right here that can kill you." But no one else present in the small breakfast nook—Mrs. Clem, Yacob, and Officer Nelson—recalls hearing this statement. Mrs. Clem has testified that her husband neither made any threat nor said he had anything in his pocket. Officer Nelson asserts that Clem did "reach[ ] for his pocket, feeling it," but that "[t]here was nothing there." Indeed, Officer Nelson further testified that "[t]hroughout the period of time that [he] w[as] in the Clem home" he was "satisfied that Robert Clem did not have a weapon." As the conversation continued, Mr. Clem went "red in the face" and stood up, raising his empty hands. According to Corbeau, Clem again verbally threatened him; but the other witnesses testify that they heard no threat. Mrs. Clem remembers, instead, that Officer Corbeau had provoked her husband by "standing right in front of him and . . . yelling at him," insisting that he go to his doctor.

At this point, Officer Corbeau discharged a cloud of pepper spray that struck Mr. Clem and, both officers agree, quickly disabled him. According to Corbeau, Clem "backed up rather quickly" and "grabbed his eyeballs." Nelson testified that Clem was "disabled" and "dismay[ed]," "feeling the effects" of the pepper spray; Clem made a "moaning sound or groaning," and "motion[ed] about his eyes, grabbing his face." Mr. Clem, Officer Nelson testified, was "not being aggressive to anyone."

Officer Nelson then went to assist Mrs. Clem and Yacob, who had also been struck by some of the pepper spray. He led the two of them out of the breakfast area, and through the living room and down a hallway to the bathroom, where they could wash off the pepper spray. Nelson then descended a flight of stairs, leaving his partner alone on the second floor with Mr. Clem, and poked his head outside to spit the taste of pepper spray into the street. He called for medical assistance and a supervisor, but did not warn of any danger or ask for any backup.

When Officer Nelson finished the call, about two minutes after the spraying, he walked back up the stairs and found Mr. Clem in the living room. Before long, Clem began to recover from the pepper spray and began cursing at and walking toward Nelson; the officers agree that Clem's hands were open and out in front of his body. The officers have described Mr. Clem's movements variously as "grabbing," "flailing," and "waving his arms around." Nelson backed a few feet away from Clem, and, when Clem continued walking, Nelson hit him in the face with a sustained stream of pepper spray lasting several seconds.

According to Corbeau, who was watching from a few feet away, Clem turned away from Nelson immediately. And, both officers agree, Clem made either "no contact" at all or just "brushed" Nelson's arm. Nelson contends that the pepper spray had no effect on Clem, but offers no other explanation as to why Clem stopped moving toward him; indeed, Nelson testified that although he did not punch, push, or otherwise physically force Clem, nevertheless Clem did turn away. As soon as he turned, Clem went around a table in the middle of the room, toward the hallway that led to the bathroom. Mrs. Clem, who was still in the bathroom, heard her hus-

band breathing with great difficulty, as though the pepper spray had constricted his nose and throat.

At this moment Officer Corbeau, still watching Mr. Clem and Officer Nelson, stood near the head of the hallway with his 26 inch, metal baton fully extended in his left hand. Corbeau maintains that he told Clem to "get back" and that Clem only snarled and threatened him. Mrs. Clem, just a few feet from Corbeau, recalls no such warning from Corbeau, or threat from Mr. Clem-only that her husband was making a noise that sounded like "hah, hah, hah" as a result of his breathing difficulty. Officer Corbeau then backed about four feet down the 15 foot hallway until he was even with the (open) bathroom door. Although Corbeau now asserts that Clem rapidly "charged" him, both officers originally told police investigators that Mr. Clem was "not running," but rather "stomping" forward in a "very odd" manner like a "robot," with his hands open and waving in front of him, movements consistent with his recent subjection to pepper spray.[1]

Mrs. Clem and Yacob, who were still in the bathroom, saw Corbeau come into view in the hall through the bathroom doorway. They next saw Officer Corbeau unholster his duty weapon, place the weapon in his right hand, and, without telling Mr. Clem that he must stop or be shot, fire down the hallway three times in quick succession directly at Mr. Clem. One bullet went through Mr. Clem's leg; two more lodged in his intestines.

Officer Nelson, who was less than five feet behind Mr. Clem when the shots were fired, testified that he was "shocked" and "surprised" by the shooting. It is undisputed that Officer Nelson's immediate reaction was to call out: "No!" Nelson had been following Clem, more or less keeping pace but a few steps behind him. Nelson had not unholstered his own weapon, and apparently did not expect his partner to do so, either; his pursuit took him directly into Corbeau's line of fire, and Nelson was fortunate not to be hit by an errant round. Neither he nor Officer Corbeau was injured in any way, and no weapons were found on or around Mr. Clem.

On September 1, 2000, Mr. Clem filed suit in state court, alleging that Officers Corbeau and Nelson had used unconstitutionally excessive force when they subjected him to pepper spray and that Corbeau had also done so when he shot Clem three times. In addition, Clem alleged that Fairfax County and its police chief should be held liable for failure to provide adequate training and supervision. Finally, he brought state law claims for gross negligence, assault, and battery.

■■■■ After the defendants removed the case to federal court, Clem moved for partial summary judgment with respect to his claims against Officer Corbeau, and the defendants moved for summary judgment on all claims. The district court granted summary judgment to the County, the police chief, and Officer Nelson on all claims. The court granted Officer Corbeau summary judgment on the claim that his use of pepper spray constituted excessive force, but denied summary judgment to both Mr.

---

1. All of the witnesses have given several accounts of these events, some to police investigators and others during litigation, and on a number of points contradict themselves. A conflict between an investigator's notes and a sworn statement does not present the situation discussed in *Rohrbough v. Wyeth Labs.,* *Inc.,* 916 F.2d 970, 976 (4th Cir.1990) (ruling that district court was "justified" when it disregarded a sworn statement conflicting with an earlier *sworn* statement), but a fact finder could certainly consider such a conflict in assessing a witness's credibility.

Clem and Officer Corbeau on the excessive force claim that arose from the shooting. Only Officer Corbeau appeals. We now consider his contention that he is entitled to qualified immunity with respect to Clem's excessive force shooting claim, but dismiss his interlocutory appeal of denial of summary judgment on Clem's state law claims.[2]

## II.

■ The Supreme Court recently clarified that in excessive force cases, as in all other cases, entitlement to qualified immunity must be analyzed in two steps, which are to be "considered in proper sequence." *See Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001). As a "threshold question," a court must ask whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show [that] the officer's conduct violated a constitutional right." *Id.* at 2156. If the answer is "no" then the analysis ends; the plaintiff cannot prevail. *Id.*

If the answer is "yes," then "the next, sequential step is to ask whether the right was clearly established" at the time of the events at issue. *Id.* This determination must be made "in light of the specific context of the case, not as a broad general proposition." *Id.* If the right was not "clearly established" in the "specific context of the case"—that is, if it was not "clear to a reasonable officer" that the conduct in which he allegedly engaged "was unlawful in the situation he confronted"—then the law affords immunity from suit. *Id.* Accordingly, the answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a defendant police officer's motion for summary judgment on qualified immunity grounds.

### A.

We turn, then, to the initial question: whether, "[t]aken in the light most favorable to the party asserting the injury," i.e. Clem, "the facts alleged show that" Officer Corbeau's "conduct violated a constitutional right." *Saucier,* 121 S.Ct. at 2156. Clem maintains that the facts outlined above, considered in the light most favorable to him, demonstrate that Officer Corbeau violated his Fourth Amendment right to be free from the use of excessive force by police officers in effecting an arrest or other seizure.

■ Indisputably, the Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive

---

**2.** The order denying Corbeau's motion for summary judgment on the excessive force claim is immediately appealable because it involves rejection of a qualified immunity defense, which would be "effectively lost" if the case were "erroneously permitted to go to trial," and so is a final decision under the collateral order doctrine. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). On interlocutory appeal, however, our jurisdiction is limited to legal issues, e.g., "whether uncontroverted conduct represented the use of excessive force," *Elliott v. Leavitt,* 99 F.3d 640, 644 (4th Cir.1996), or "whether the federal right allegedly infringed was 'clearly established.'" *Behrens v. Pelletier,* 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (citation omitted). Assuming that we have pendent appellate jurisdiction of the order denying summary judgment on the state law claims, *but see Swint v. Chambers County Comm'n,* 514 U.S. 35, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), the decision to exercise such jurisdiction is purely discretionary. *DiMeglio v. Haines,* 45 F.3d 790, 808 (4th Cir.1995). "[T]aking into consideration the factors of judicial economy, injudicious intermeddling, and justice in the disposition," *id.* (internal quotation marks and citation omitted), we decline to exercise that jurisdiction here, and so dismiss Corbeau's appeal from the order denying him summary judgment on Clem's state law claims.

force against a free citizen, like Clem. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Whether an officer has used excessive force is judged by a standard of objective reasonableness. *Id.* at 396–97, 109 S.Ct. 1865. We do not inquire into an officer's motives, intentions, or tendencies, and instead determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott,* 99 F.3d at 642 (citing *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865).

■ Because this test requires us to determine the reasonableness of an officer's actions, it is "not capable of precise definition or mechanical application," *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), but rather "requires careful attention to the facts and circumstances of each particular case." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Recognizing that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving"—we take care to consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the "20/20 vision of hindsight." *Id.* at 396, 397, 109 S.Ct. 1865. We must determine "whether the totality of the circumstances justifie[s]" the use of deadly force given all the circumstances of the case before us. *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), *quoted with approval* in *Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *see also Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir.1994) (stating that courts must avoid making "[a]rtificial divisions in the sequence of events," and should instead view the evidence "in full context, with an eye toward the proportionality of the force in light of all the circumstances").

■ In doing so, we must carefully balance "the nature and quality of the intrusion on an individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation marks and citation omitted). When deadly force is at issue, the Supreme Court has long recognized that the intrusion on Fourth Amendment rights is "unmatched." *Garner,* 471 U.S. at 9, 105 S.Ct. 1694 ("The intrusiveness of a seizure by means of deadly force is unmatched."). Such force is therefore justified only where a reasonable officer would have "sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott,* 99 F.3d at 642 (citation omitted); *see also Garner,* 471 U.S. at 11, 105 S.Ct. 1694 (stating that the Constitution does not permit "the use of deadly force" against a person who "poses no immediate threat to the officer and no threat to others").

■ Officer Corbeau contends that the undisputed facts establish that a reasonable police officer in his position would have had sound reason to believe that Clem was armed or otherwise sufficiently dangerous to justify the use of deadly force. Review of the record evidence summarized above, however, renders this contention untenable. Unquestionably, Clem has proffered evidence, which, if credited, would lead to the conclusion that a reasonable police officer could not have believed him to be in possession of a weapon, or otherwise to pose a threat of serious harm to anyone at the time of the shooting. To be sure, Officer Corbeau has proffered contrary evidence. But the Supreme Court has expressly directed that in determining whether a plaintiff has stated the violation of the constitutional right to be free from excessive police force, the facts are to be "[t]aken in the light most favor-

able to the party asserting the injury," *Saucier*, 121 S.Ct. at 2156, and here that party is Clem.

Although Corbeau claims to accept *Saucier* as the governing standard, much of his appellate argument is based on ignoring it. For example, Corbeau points only to two disputed assertions in maintaining that a reasonable officer could have believed that Clem was armed.[3] First, he relies on his testimony that Clem patted his pocket in the breakfast nook and claimed to have something that could "kill you." But Mrs. Clem, who was also in the breakfast nook at the time, denies hearing any such threat, or indeed, any reference to anything in her husband's pocket. Officer Nelson, for his part, testifies that Mr. Clem did not make any threat to kill Corbeau or anyone else, and that, although Clem patted his pocket, "[t]here was nothing there." Second, Corbeau asserts that while he was en route to the Clem home he received a radio message informing him that Clem had threatened his wife with a knife five weeks earlier. But Corbeau himself concedes that any such report was erroneous (Clem never threatened his wife and, in fact she had persuaded him to get in the car to go to the hospital before police arrived) and that Nelson, who had answered the earlier call, "may have" informed Corbeau of the truth before the officers ever entered the Clem house on November 9, 1998. Thus, the *only* evidence that Corbeau cites in support of his contention that he reasonably perceived Clem to be armed *on that date* is disputed.

Moreover, whatever Corbeau thought he heard Clem say and whatever he understood about the earlier incident, there is considerable evidence that a reasonable officer in Corbeau's position could not have perceived that Clem was, in fact, armed on November 9. For example, Nelson—and Corbeau himself—have testified that on that day they spent several minutes close to Clem in the small breakfast nook and saw nothing to even suggest that Clem was armed—no bulges in his pockets or waistline, nor anything in his open shirt. And during the crucial moments immediately before the shooting, again both Nelson *and* Corbeau have testified that Clem's hands were obviously empty, and that Clem never reached into his pockets or clothing. Indeed, notwithstanding Corbeau's litigating position, Officer Nelson has testified that "throughout" the encounter in the Clem home on November 9 he was "satisfied that Robert Clem did not have a weapon."[4]

---

**3.** We also note that Officer Corbeau's litigating position is at odds with the statements he made to police investigators in the months immediately after the shooting. In the course of two separate interviews, Corbeau was asked why he had shot Clem and did not say he had done so because Clem was, or could have been, armed. Later, Corbeau reviewed a transcript of the second of these interviews and, with his signature, attested to the truthfulness and accuracy of the answers therein. Corbeau made his first contention to the contrary more than a year and a half later, after this litigation began.

**4.** The facts here, therefore, viewed in the best light for Clem, present a very different case than one in which "the evidence conclusively established" that the officers on the scene "perceived" the person shot "to be armed." *See, e.g., Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir.2001). For this reason, Corbeau's reliance on *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir.1998), is misplaced. As we recently explained, *Sigman* "addressed a situation in which officers had *uncontroverted evidence* of a suspect's dangerousness and knew that the suspect was armed and was behaving violently within a residence." *Rogers v. Pendleton*, 249 F.3d 279, 292 (4th Cir.2001) (emphasis added). In that context, the *Sigman* court "held that the statements of persons who claimed to have observed, from a cheering mob on the other side of the street, that the suspect was unarmed did not create a triable issue of material fact

Alternatively, Corbeau contends that even if a reasonable officer could not have believed that Clem was armed, such an officer nevertheless could have believed that Clem posed an immediate threat of bodily harm. This contention suffers from the same flawed approach as his initial argument. Corbeau again purports to rely on uncontroverted facts, when, in reality, the relevant facts are hotly disputed. Thus, Corbeau contends in his appellate brief that it is "undisputed" that "multiple" uses of pepper spray did "not deter[ ]" Clem, and that, after being sprayed, the "much larger" Clem rapidly "charg[ed]" Corbeau, leaving Corbeau no choice but to shoot.

But actually each of these points is disputed. As for the effectiveness of the pepper spray, Corbeau himself told police investigators that after the first dose, Clem "grabbed his eyeballs" and "backed up"; Officer Nelson agreed that Clem was "disabled" and "feeling the effects" of pepper spray, "moaning," "grabbing his face" and "not being aggressive." The officers' accounts of Mr. Clem's movements in the living room, after the second spraying, suggest that Clem was affected again. Certainly, neither officer has offered any other explanation of why Clem turned away from Nelson, without making contact, "as soon as he got maced." With regard to Clem's size advantage, although Clem was larger than Corbeau (6'0" and 220 pounds versus 5'10" and 175 pounds), there is a dispute as to whether Clem could have appeared threatening to a reasonable officer in the position of Corbeau. Clem was 58 years old, assertedly blinded

and gagging from pepper spray, and known to the officers to be mentally ill and a heavy smoker who had refused to move or eat for days; Corbeau, in sharp contrast, was a 28 year old, recently discharged Marine with a 26 inch metal baton in hand and Clem in front of him. Finally, as to Clem's rapid "charging" of Corbeau, police investigators who questioned the officers after the incident testified that both Corbeau and Nelson initially characterized Clem as "not running" but as "step[ping]" in an awkward manner.

In sum, viewed in the light most favorable to Clem, the evidence is that Corbeau shot a mentally disabled, confused older man, obviously unarmed, who was stumbling toward the bathroom in his own house with pepper spray in his eyes, unable to threaten anyone. Of course, Clem ultimately may not be able to prove these facts, but, if he can, it would require no improper second-guessing, or the application of "20–20 . . . hindsight," to conclude that Officer Corbeau violated Mr. Clem's Fourth Amendment right to be free from excessive police force. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

### B.

Having determined that Clem has alleged a violation of a constitutional right, we must now proceed to the second sequential step of the *Saucier* analysis—determination of whether Officer Corbeau is nonetheless entitled to qualified immunity from suit.

■ Again, the standard is one of objective reasonableness: "whether a reason-

---

where *the officers closest to the encounter unanimously . . . perceived the suspect to be armed." Id.* (emphasis added and citation omitted). Here there is no "uncontroverted evidence" that Clem was armed or "unanimously perceived to be armed" by officers on the scene; indeed, Corbeau's present account

is disputed not only by Clem's wife and nephew, who were close at hand and not across the street, but also by Corbeau's fellow officer, Nelson, and even by some statements made by Corbeau himself. And, unlike in *Sigman*, no weapon was found on or near Mr. Clem after the shooting.

able officer could have believed [the conduct at issue] to be lawful, in light of clearly established law and the information the ... officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, we must ascertain whether in using excessive force the officer made a "reasonable mistake[ ] as to the legality of [his] actions." *Saucier*, 121 S.Ct. at 2159. We may assume that Corbeau subjectively believed that the force he used was not excessive; that, however, is not the question. The question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 2153. Applied in this manner, the test "operates ... to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 2158 (internal quotation omitted).

To carry out this analysis, we must consult relevant case law to determine whether a closely analogous situation had been litigated and decided before the events at issue, making the application of law to fact clear. *See Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). In doing so, however, we must also keep in mind the Supreme Court's warning that this is not a mechanical exercise, and that the test is *not* whether "the very action in question has previously been held unlawful," but rather, whether pre-existing law makes the unlawfulness of an act "apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034.

■■■ Accordingly, a constitutional right is clearly established for qualified immunity purposes not only when it has been "specifically adjudicated" but also when it is "manifestly included within more general applications of the core constitutional principle invoked." *Buonocore v. Harris*,

65 F.3d 347, 357 (4th Cir.1995) (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir.1992)). Thus, "when 'the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir.1994) (quoting *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir.1993)). To hold otherwise would allow an officer who understood the unlawfulness of his actions to escape liability simply because the instant case could be distinguished on some immaterial fact, or worse, because the illegality of the action was so clear that it had seldom before been litigated. *See, e.g., K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir.1990).

■■■ In the case at hand, Clem has proffered evidence that Officer Corbeau shot and severely injured him, even though a reasonable police officer in Corbeau's position would have perceived Clem to be unarmed, blinded, and stumbling, in no condition to pose any threat to the officer. On this set of facts, the law in 1998 provided clear guidance to a police officer that he was not free to use deadly force. Certainly, it was well established, as the district court found, that Clem had a right "to be free from the use of deadly force absent a belief by the officer that [he] pose[d] a threat of serious physical harm." *Clem v. County of Fairfax*, 150 F.Supp.2d 888, 893 (E.D.Va.2001) (citing *Garner*, 471 U.S. at 11, 105 S.Ct. 1694; *Elliott*, 99 F.3d at 642–43; *Foote v. Dunagan*, 33 F.3d 445 (4th Cir.1994); *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir.1994); *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir.1991)).[5]

5. Although the district court properly relied on *Garner* and our precedents to reach the

Speaking with somewhat more specificity, the Supreme Court had expressly stated thirteen years before that "deadly force" may not be used by a "police officer ... [to] seize an unarmed nondangerous suspect." *Garner*, 471 U.S. at 11, 105 S.Ct. 1694. In this case, of course, there can be little doubt that Clem has offered evidence that he was "nondangerous" and that firing three shots at close range was an application of force that could have killed him. Therefore, on the basis of *Garner* alone, (which the Supreme Court decided in 1985), we would have to conclude that the constitutional right at issue in this case was "clearly established" in November 1998.

We also note, however, that no post-*Garner* case even suggests to the contrary, and that several courts applied *Garner* years before 1998 to deny qualified immunity when officers used deadly force to arrest assertedly unarmed and non-threatening persons inside their homes. *See McKinney ex rel. McKinney v. DeKalb County*, 997 F.2d 1440, 1443 (11th Cir. 1993); *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir.1988); *see also Cooper v. Merrill*, 736 F.Supp. 552, 559–61 (D.Del.1990). The lack of more cases with similar facts is due to the clarity, rather than the ambiguity, of the *Garner* rule. Indeed, in this circuit, we have found only one case in which an officer sought qualified immunity on facts like those alleged by Clem, and there we con-

cluded that the officer's appeal of the denial of qualified immunity was so lacking in novelty as not to merit publication. *See Haddaway v. Ellerbusch*, 996 F.2d 1211, 1993 WL 238997 (4th Cir. June 30, 1993) (affirming denial of immunity to an officer who, when responding to 911 call, allegedly shot a large woman with history of violent behavior, who was "angry," holding a pair of scissors, and standing a few feet from the officer). As the Seventh Circuit has observed in an analogous situation, the absence of many similar cases "demonstrates nothing more than widespread compliance with well-recognized constitutional principles." *Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir.1994).

Well before 1998 it was clearly established that a police officer could not lawfully shoot a citizen perceived to be unarmed and non-dangerous, neither suspected of any crime nor fleeing a crime scene. The decision to use deadly force in these circumstances simply does not lie near the "hazy border between excessive and acceptable force," and any mistaken belief to the contrary would not have been reasonable. *Saucier*, 121 S.Ct. at 2158 (citation and internal quotation marks omitted). Accordingly, Officer Corbeau is not entitled to qualified immunity, as a matter of law, on the present record.

## III.

For the foregoing reasons, we affirm the district court's denial of summary judg-

---

above holding, the court later incorrectly observed that "police officers cannot use deadly force against a mentally ill person who is neither armed nor reasonably perceived to be armed, and who has committed no crime, merely because of a fear that the person might take the officer's weapon." *Clem*, 150 F.Supp.2d at 895. Actually, the law is clear that a reasonable officer is sometimes authorized to use deadly force against an unarmed, mentally ill person, i.e., when the officer has a "sound reason to believe" that such a person "poses a serious threat to [his] safety or the

safety of others." *Elliott*, 99 F.3d at 644. The district court also erroneously suggested that Corbeau's subjective "actual belief at the time of the shooting" had some relevance in determining his entitlement to qualified immunity. *See Clem*, 150 F.Supp. 2d at 895. In fact, an officer's entitlement to qualified immunity depends not on his subjective beliefs but rather on "the *objective* (albeit fact-specific) question whether a reasonable officer could have believed [the relevant conduct] to be lawful." *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034 (emphasis added).

ment on the excessive force claim, and dismiss the appeal from the portion of the district court's order denying summary judgment on the state law claims.

*AFFIRMED IN PART AND DIS-MISSED IN PART.*