Dwayne SWANN, Plaintiff,

v.

**CITY OF RICHMOND,
et al., Defendants.**

Civil Action No. 3:06CV069.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 3, 2007.

---

Steven David Benjamin, Betty Layne Desportes, Benjamin and Desportes, Rich-

mond, VA, Carmen Louise Christopher, Gina Lee Paik, John E. Hall, Joshua David Wolson, Covington & Burling, Washington, DC, for Plaintiff.

David John Freedman, Susan Lee Parrish, William Joe Hoppe, Office of the City Attorney, Richmond, VA, for Defendants.

### MEMORANDUM OPINION

PAYNE; Senior District Judge.

This matter is before the Court on Defendant Kevin Paul Hathaway's Motion for Summary Judgment (Docket No. 84), Defendant James Earl Wilson's Motion for Summary Judgment (Docket No. 86), and Defendant Michael Sean Mocello's Motion for Summary Judgment (Docket No. 88). For the reasons set forth below, the motions are granted.

### I.

On February 2, 2006, Dwayne Swann ("Swann" or "Plaintiff") filed this action against the City of Richmond, Officer Kevin Paul Hathaway ("Hathaway"), Officer James Earl Wilson ("Wilson"), and Officer Michael Sean Mocello ("Mocello"). On July 26, 2006, Senior United States District Judge Richard L. Williams granted the defendants' Motion to Bifurcate (Docket No. 21), and the case was segmented so that it would proceed first against the individual officers and, if they were liable, then against the City. These motions for summary judgment address only the claims against the officers, individually.

Swann alleges that each of the three defendant officers violated his constitutional and common law rights. His complaint consists of the same five counts against each officer. Count I alleges common law assault; Count II alleges common law battery; Count III alleges gross negligence; Count IV alleges intentional infliction of emotional distress; and Count V alleges a claim under 42 U.S.C. § 1983 for arbitrary, excessive, and unreasonable use of force in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

The three officers have filed motions for summary judgment on each of the five claims, pursuant to Fed.R.Civ.P. 56. They each allege that they did not violate Swann's constitutional or common law rights and that they are entitled to qualified immunity. Discovery is concluded, the issues are fully briefed and have been argued orally.

### II.

The facts must be considered in the light most favorable to the Plaintiff, according him the benefit of all reasonable inferences and resolving factual disputes in his favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The record facts are thusly presented below.

On the night of February 3 and early morning hours of February 4, 2004, members of the City of Richmond Police Department's Robbery Task Force were charged with locating two violent robbery suspects—David White and Quan Tillery—who were reportedly in Hillside Court, a high-crime area in the City of Richmond. The Robbery Task Force is a plain-clothes unit charged with solving robberies and other violent crimes. All three defendants, Hathaway, Mocello, and Wilson, were members of the task force.

That night, the officers drove through Hillside Court in unmarked cars. Although the officers wore plain clothes, they were also wearing black vests over their clothing that had large fluorescent lettering that said "RICHMOND POLICE" and a picture of a large police badge. The officers had no set plan other than for two

teams to enter the area from different directions and drive through the neighborhood to see if the suspects could be located and arrested. One team, led by Sergeant Pence, entered Hillside Court from Harwood Street; the other, led by Sergeant Shapiro, entered from Bruce Street. The idea was to travel in separate groups so that, if a suspect ran from one group, the other group could cut off the fleeing suspect. The weather that night was extremely cold, with snow and ice on the ground.

As the officers entered Hillside Court, Sergeant Pence radioed that there were three or four individuals standing in a "cut" between two buildings. One of those individuals was later identified as Swann. Pence also broadcast that an individual was reaching toward his waistband and making a throwing motion. Hathaway heard Pence's transmission and observed the individuals mentioned. He also observed the individual later identified as Swann making a throwing motion. Hathaway decided to exit his vehicle and approach the individuals. As he approached, the individuals dispersed, and began to walk away quickly. Swann then took off running. Hathaway gave chase on foot. Wilson joined in the chase. Mocello, still in his vehicle, observed police officers running through the apartment complex chasing Swann. He turned and followed Swann in his vehicle.

The chase ended when Swann jumped into the rear passenger seat of a 1994 Nissan Altima ("Nissan") parked on the side of Bruce Street. Another individual, Taiquan Byrd, was already in the front passenger seat of the Nissan. Officers arrived on foot and in vehicles immediately thereafter. Several officers, including the defendants, surrounded the vehicle, shouting commands like, "Police," "Let us see your hands" and "Get out of the car." Neither Swann nor Byrd complied with these commands. Swann notes, however, that he could not hear most of those commands because Edwards, another officer at the scene, was banging on a window of the car with a flashlight.

At this point, Hathaway was standing in front of the car, near its center. Wilson also was standing in front of the car, but to Hathaway's left, and was closer to the curb. There was a van parked behind the two of them, slightly less than a car length away. Mocello was standing at the rear of the car, toward the driver's side. Pence's car was parked directly alongside the Nissan, leaving a small gap between the Nissan and the van.

The testimony of some officers in attendance suggests that, when Swann initially got into the car, he laid down across the rear seat, but then began to move around.[1] *See, e.g.*, (Wilson Dep. 71:3–13, 94:8–15, Aug. 21, 2006; Mocello Dep. 153:17–154:11, Aug. 22, 2006; Pence Dep. 191:18–192:2, October 5, 2006.) Mocello, for instance, notes that Swann "continued to move back and forth between his waist and the floor of the car, keeping his hands hidden from view." (Mocello Dep. 153:17–154:11, 167:13–168:20.) Pence testified that he saw Swann "moving upwards and backwards" and that, if he had been standing where the other officers were, he would have drawn his weapon and aimed it at Swann because of the nature of Swann's movements. (Pence Dep. 191:18–192:2.) Hathaway noted that he saw Swann "bent down with his hands at his waist, making movements toward the floorboard and his

---

1. Swann maintains that there is a factual dispute about his actions in the backseat of the Nissan immediately prior to the shooting.

However, as discussed below, there is no material factual dispute about this issue.

waist." (Hathaway Dep. 112:20–25, Aug. 23, 2006.)

Shortly after the officers arrived at the Nissan, Byrd was observed moving from the passenger seat of the Nissan to the driver's seat. As a result of this action, Hathaway drew his weapon, aimed it at Byrd, and gave him commands to "stop," "don't move," and "don't do it." Byrd did not comply with these commands. Instead, he put the Nissan in gear and hit the accelerator. The Nissan accelerated forward, away from the curb, and toward the street. As the car moved out from the curb, it hit Wilson, striking his left leg and knocking him to the ground, inflicting what later were determined to be minor injuries.

As the Nissan accelerated, all three defendant officers began firing into the car. Hathaway fired the first shot. He fired a total of three shots. His first bullet went through the windshield and into the driver's side door. His second bullet was recovered from Byrd's right calf. His third bullet was recovered in the passenger side door post of the Nissan. The first two bullets indisputably did not hit Swann. As discussed below, the parties dispute whether Hathaway's third bullet could have hit Swann.

Mocello heard gunshots and shattering glass at the same instant he saw the Nissan strike Wilson. Mocello responded by firing his gun four times. He fired the first shot at Byrd, and the three remaining shots at Swann. Two of Officer Mocello's four bullets hit Swann and were later removed from his body.

After being struck by the car, Wilson fired his weapon twice, as the car was passing him or just after it had passed him. One of those bullets was recovered from under the front passenger seat of the Nissan. The trajectory of the other bullet is unclear, though it may have traveled through a tire.

In the aftermath of the shooting, Byrd crashed the Nissan into a parked tractor-trailer truck across the street. Swann was removed from the Nissan by officers McQuail, Mocello, and Shapiro. Hathaway and Wilson do not appear to have had any physical contact with Swann in the aftermath of the shooting. Although he had been shot and was obviously in pain, Swann's arms were forced behind him and he was handcuffed.

Swann eventually was taken to a local hospital and treated for five bullet wounds. One bullet went through his front shoulder; one went through his lower back; one lodged in his buttocks; one lodged in his right leg; and one went through his right leg. One of these shots caused a fracture to his right proximal fibula. While at the hospital, Swann also tested positive for opiates and cocaine. He was hospitalized for four days, suffering at least one seizure during that time. Wilson was also taken to the hospital. He was diagnosed with a bruise to his leg and given Motrin.

After his hospitalization, Swann developed infections in his leg from the bullet wounds and has had multiple surgeries, including one to remove the bullets that were still in his body. Bullet fragments remain embedded in every place he was shot. He now walks with a limp and has to use a cane on occasions. Additionally, it is also alleged that his sex life with his wife has suffered, and he has difficulty engaging in normal daily activities like walking up and down stairs, lifting and moving objects, and bending and twisting. He also claims to suffer from anxiety that interferes with his daily interactions. He alleges that he has nightmares regularly and is scared to sleep.

## III.

The standard for assessing summary judgment motions is well-established. Summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the Court may rely upon "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R.Civ.P. 56(c).

In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Nguyen v. CNA Corp.*, 44 F.3d 234, 236 (4th Cir.1995). A fact is material when proof of its existence or nonexistence would affect the outcome of the case and is in dispute "when its existence or non-existence could lead a jury to different outcomes." *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir.2001). A party cannot, however, "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985).

The nonmoving party is entitled to have his version of all that is disputed accepted, all conflicts resolved in his favor, and to have the benefit of all favorable legal theories invoked by the evidence. *M & M Med. Supplies and Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir.1992). The party who bears the burden of proof on an issue at trial cannot, however, survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). These precepts and standards govern the resolution of the defendants' motions.

## IV. Swann's § 1983 Claims

In Count V of the Complaint, Swann alleges that each of the three defendants, "while acting under color of state law, wrongfully shot Mr. Swann and used excessive force after the shooting in a show of arbitrary, excessive, and unreasonable force, in violation of Mr. Swann's rights under the Fourth and Fourteenth Amendments of the United States Constitution." (Compl. ¶¶ 53, 54, 55.) All three defendants have moved for summary judgment on this claim.

To state a claim under 42 U.S.C. § 1983, a plaintiff "must allege the violation of a right secured by the Constitution ... and must show that the alleged deprivation was committed by a person acting under color of state law." [2] *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Of course, § 1983 "is not itself a source of substantive rights," but instead is "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Where, as here, the asserted claim is the excessive use of force that "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as [a § 1983 claim] invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person." *See Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865,

---

**2.** Here, it is undisputed that the three defendant officers were acting under color of state law.

104 L.Ed.2d 443 (1989) (quoting U.S. CONST. amend. IV). Such claims are "analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Id.* at 388, 109 S.Ct. 1865.

■■■ *Test of Objective Reasonableness:* Determining whether the force used to seize an individual is "objectively reasonable" requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). It "has long been recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. The extent to which such physical coercion or threats are reasonable depends on the circumstances in which the police-citizen encounter occurs and how and why the force was applied. The Supreme Court has explained that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish,* 441 U.S. 520, 529, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Instead, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. The Fourth Circuit has added that the fundamental question in these sorts of cases "is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell,* 247 F.3d 125, 129 (4th Cir.2001).

The Supreme Court has also made clear that the "reasonableness" of a particular use of force "must be judged from the perspective of the officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Moreover, the "reasonableness" must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. The Fourth Circuit instructs that the proper focus in these cases "should be on the circumstances *at the moment force was* used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir.1996)(emphasis added). Additionally, this calculus must be made "without regard to [the police officer's] underlying intent or motivation, which is irrelevant under the objective test." *Graham,* 490 U.S. at 397, 109 S.Ct. 1865.

■■■ *Deadly Force:* When deadly force is used, the Supreme Court has "long recognized that the intrusion on Fourth Amendment rights is 'unmatched.'" *Clem v. Corbeau,* 284 F.3d 543, 550 (4th Cir. 2002) (quoting *Tennessee,* 471 U.S. at 9, 105 S.Ct. 1694). The Court has held, moreover, that deadly force is reasonable only "[w]here [an] officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others." *Garner,* 471 U.S. at 11, 105 S.Ct. 1694; *Gray–Hopkins v. Prince George's County,* 309 F.3d 224, 231 (4th Cir.2002); *see also McLenagan v. Karnes,* 27 F.3d 1002, 1006–07 (4th Cir. 1994). Thus, "if the suspect threatens the officer with a weapon or there is probable

cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner,* 471 U.S. at 11–12, 105 S.Ct. 1694.

However, as the Fourth Circuit explained in *Anderson v. Russell,* 247 F.3d 125, 131 (4th Cir.2001), "[t]his Circuit has consistently held than an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." An officer is not required "to actually detect the presence of an object in a suspect's hands before firing on him," if he or she otherwise has a reasonable belief that the suspect may be armed. *McLenagan,* 27 F.3d at 1007. The Fourth Circuit explained that "the Fourth Amendment does not require omniscience ... Officers need not be absolutely sure ... of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection." *Russell,* 247 F.3d at 132 (quoting *Elliott,* 99 F.3d at 644).

Moreover, it is settled that courts cannot "second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others," because "§ 1983 does not purport to redress injuries resulting from reasonable mistakes." *McLenagan,* 27 F.3d at 1007–08. This means, for instance, that a court should not consider whether an officer "failed to utilize available cover," or otherwise could have responded differently, because this is precisely the type of judicial second-guessing that precedent prohibits. *Russell,* 247 F.3d at 131. Additionally, the seriousness of the suspected criminal activity does not matter, because the focus of the court should be on "the circumstances as they existed at the moment force was used." *Id.* at 132.

In *McLenagan v. Karnes,* for example, the Fourth Circuit ruled in favor of a defendant police officer who shot an unarmed arrestee at a sobriety checkpoint. *McLenagan,* 27 F.3d at 1009. McLenagan, the victim arrestee, was sitting in a temporary restraining and courtroom area near the checkpoint when another arrestee stole a gun from the magistrate's desk, causing others in the building to flee. *Id.* at 1004–05. As McLenagan fled the scene behind a deputy, the deputy yelled "The man has got a gun!" several times. *Id.* at 1005. Karnes, an officer witnessing this scene, mistakenly believed that the deputy was referring to McLenagan, and shot him. *Id.* The Fourth Circuit found that, even though Karnes did not see a gun in McLenagan's hands (which were handcuffed in front of him at the time), he also "could not confirm that McLenagan was unarmed," and had to make a "split-second judgment" in a situation "where inaction could have resulted in death or serious injury to the officer and others." *Id.* at 1007–08. As such, the Fourth Circuit found that Karnes' actions did not contravene the Fourth Amendment. *Id.* at 1009.

Similarly, in *Russell,* the Fourth Circuit found that an officer's use of force did not violate the Fourth Amendment (and thus that the § 1983 excessive force claim should not have been submitted to a jury) where an officer shot an unarmed man in a mall parking lot. *Russell,* 247 F.3d at 129. In *Russell,* Russell, a police officer, observed Anderson walking through the mall with a bulge on the left side of his body near his belt. *Id.* at 127–28. The bulge turned out to be a shoe polish container inside an eyeglasses case, but appeared to Russell to be in the shape of a handgun. As a result, Russell followed Anderson

when he exited the mall, approached Anderson with his gun drawn and instructed Anderson to raise his hands and get down on his knees. *Id.* at 128. While Anderson "initially complied with the order to raise his hands, he later lowered them without explanation in an attempt to reach into his back left pocket to turn off his Walkman radio." *Id.* Believing that Anderson was reaching for a weapon, Russell shot Anderson three times, leaving him with permanent injuries. *Id.* In the ensuing § 1983 action, the Fourth Circuit ruled in favor of Russell, noting that "the evidence conclusively establishe[d] that Russell reasonably perceived Anderson to be armed with a gun." *Id.* at 130. As a result, when Russell saw Anderson reaching toward his pocket, Russell "reasonably believed that Anderson posed a deadly threat to himself and others," justifying Russell's use of deadly force. *Id.* at 132.

On the other hand, in *Clem v. Corbeau*, 284 F.3d 543, 552 (4th Cir.2002), the Fourth Circuit found that an officer's use of deadly force against a mentally ill suspect was not justified under the Fourth Amendment because a reasonable officer under the same circumstances would not have believed that the suspect posed a threat of serious injury to the officer or others. In that case, the victim's wife called the police to ask for help controlling the victim, who was suffering from a variety of physical and mental ailments. *Id.* at 545. The police officers who arrived on the scene noted that the victim was "out of it," and that there were "no bulges in [his] pockets or waistline nor anything in his open shirt indicating the presence of weapons." *Id.* at 546. Nevertheless, when the victim became agitated and stood up, one of the officers, Officer Corbeau, "discharged a cloud of pepper spray that struck [the victim] and ... quickly disabled him." *Id.* at 547. Several minutes later, as the victim slowly approached Cor-

beau, breathing with some difficulty, and making movements "consistent with his recent subjection to pepper spray," Corbeau shot him three times. *Id.* at 548. The Fourth Circuit concluded that "viewed in the light most favorable to Clem, the evidence is that Corbeau shot a mentally disabled, confused older man, obviously unarmed, who was stumbling toward the bathroom in his own house with pepper spray in his eyes, unable to threaten anyone." *Id.* at 552. As such, "Officer Corbeau violated [the victim's] Fourth Amendment right to be free from excessive police force." *Id.*

 *Bystanders and Intentionality:* In *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), the Supreme Court held that "[v]iolation of the Fourth Amendment requires an intentional acquisition of control." Thus, the "accidental effects of otherwise lawful government conduct" do not constitute the type of governmental misuse of power against which the Fourth Amendment was designed to protect. *Id.* The Supreme Court summarized:

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Id.* at 596–97, 109 S.Ct. 1378. The Fourth Circuit has interpreted the decision in *Brower* to mean that bystanders who are inadvertently shot by police officers trying to apprehend a fleeing criminal suspect are

not "seized" such that they would have a claim under the Fourth Amendment. *Milstead v. Kibler*, 243 F.3d 157, 163 (4th Cir.2001); *Rucker v. Harford County, Md.*, 946 F.2d 278, 281 (4th Cir.1991). Instead, such bystanders may have substantive due process claims, but even then, the test for relief is exceedingly stringent, and unlikely to be met in most cases.[3] *Id.* at 281. What that means in this case is that Swann must have been shot by a defendant to maintain a viable § 1983 claim against that defendant, and even then, that defendant must have *intentionally* shot Swann. If, for instance, any of the officers were aiming for Byrd but accidentally hit Swann instead, Swann would not have a viable excessive force claim against that officer.[4]

▮ Additionally, in assessing a plaintiff's § 1983 claims, a court should not consider the fact that a person other than the plaintiff was shot by the police. *Howerton v. Fletcher*, 213 F.3d 171, 173 (4th Cir.2000). As the Fourth Circuit noted in *Howerton v. Fletcher*, "the question is not whether the officer acted reasonably vis-a-vis the world at large. Rather, the question is whether the officer acted reasonably *as against the plaintiff.*" *Id.* The inquiry "is not dependent at all on whether the officer did or did not subject third parties to risk, or even on whether he employed unreasonable force against them." *Id.* Thus, individuals *not* shot by police officers do not have viable § 1983

excessive force claims, even if their compatriots in close proximity are shot by police gunfire. *Schultz v. Braga*, 455 F.3d 470, 479–83 (4th Cir.2006). Here, therefore, the fact that Byrd was shot by some of the defendant officers is irrelevant to Swann's case.

*Motor Vehicles:* In *Waterman v. Batton*, 393 F.3d 471, 477–80 (4th Cir.2004), the Fourth Circuit addressed the implications that the presence of a motor vehicle could have in a § 1983 case. There, officers shot at a moving motor vehicle, driven by Waterman, the plaintiff, after a high-speed chase. At the onset of the shooting, four officers were standing in front of the vehicle, some as close as 16 feet away, others about 72 feet away. Although "none of the officers were directly in front of Waterman's vehicle, they stood only a few feet to the passenger side of the vehicle's projected path." *Id.* at 474–75. Subsequently,

> Perceiving the lurching of the vehicle and Waterman's acceleration as the beginning of an attempt to run them over, Appellants began firing their weapons as soon as Waterman accelerated. As the officers shot at him, Waterman's vehicle reached a top speed of approximately 15 miles per hour. Waterman's vehicle then passed all of the officers, avoiding them by several feet and temporarily stopping behind another vehicle blocking its path. As Appellants scrambled toward Waterman, they continued to fire

**3.** According to the Fourth Circuit in *Rucker v. Harford County, Md.*, "the residual protections of 'substantive due process' . . . run only to state action so arbitrary and irrational, so unjustified by any circumstance or government interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Rucker*, 946 F.2d at 281. The state actor's conduct must "amount to a brutal and inhumane

abuse of official power literally shocking to the conscience." *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 720 (4th Cir.1991). Swann has not asserted a substantive due process claim here.

**4.** Swann contends that the Supreme Court's recent holding in *Brendlin v. California*, 551 U.S. ——, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) changes this area of the law. The Court, however, disagrees, as discussed below.

their weapons at him from the passenger side of the vehicle and from behind, ceasing their firing as he passed through the toll plaza.

*Id.* at 475. The court separated its analysis of the shooting into two parts: (1) the shots fired as the car was moving towards the officers, and (2) the shots fired after the vehicle had passed the officers, concluding that the first set of shots did not constitute excessive force, but that the second set of shots gave rise to an excessive force claim. *Id.* at 477.

As to the first set of shots, the Court of Appeals noted that there were a series of conflicting factors that the officers could have considered before shooting, including the fact that Waterman "was not stopping despite seeing the officers approaching ahead of him with their weapons drawn," and the fact "that other than his flight, no information indicated that Waterman had committed any serious crime prior to reportedly assaulting Officer Watkowski with his vehicle." *Id.* at 478. Nevertheless, the court observed that "the critical reality here is that the officers did not have even a moment to pause and ponder these many conflicting factors." *Id.* Instead, "[a] t the instant that Waterman's vehicle lurched forward, the vehicle could have reached Officers Batton and Heisey in about one second even without accelerating further, and in even less time if it had continued to accelerate." *Id.* Accordingly, "if the officers paused for even an instant, they risked losing their last chance to defend themselves." *Id.* Under those circumstances, the Fourth Circuit concluded:

> Thus, although Appellants could have held their fire and taken the chance that Waterman's acceleration in traffic was not for the purpose of committing another assault against an officer, "[t]he Constitution simply does not require police

to gamble with their lives in the face of a serious threat of harm."

*Id.* at 479 (quoting *Elliott*, 99 F.3d at 643). The court also noted that "the closeness of the officers to the projected path of Waterman's vehicle" was "crucial" to its conclusion that deadly force was justified. *Id.* at 479.

However, the court reasoned differently as to the second set of shots: those discharged after Waterman's car had passed the officers. The analysis respecting those shots began with the observation that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Id.* at 481. Applying this principle, the Court of Appeals held that:

> [T]he record, viewed in the light most favorable to the Estate, shows that once Waterman's vehicle passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots. A factfinder could reasonably conclude that as the officers pursued Waterman's vehicle, they knew or should have known that Waterman had passed them without veering in their direction. Under these circumstances, a reasonable factfinder could determine that any belief that the officers continued at that point to face an imminent threat of serious physical harm would be unreasonable.

*Id.* at 482.

### A: Swann's § 1983 Claim Against Hathaway

Hathaway contends that he is entitled to summary judgment on Swann's § 1983 excessive force claim because he did not shoot Swann, and thus, did not seize Swann. For that reasons, says Hathaway, he did not violate Swann's Fourth Amendment rights. Additionally, Hathaway ar-

gues that, even if he *did* shoot Swann, there still is not a viable § 1983 claim against him because Swann was not the intended object of Hathaway's shots, and was thus an "innocent bystander," as to whom Hathaway cannot be liable for the reasons set out in Section II above.

In the alternative, Hathaway argues that, if the Court finds that Swann can proceed under the Fourth Amendment claim, Hathaway is entitled to summary judgment because his actions were objectively reasonable. Citing *Waterman*, Hathaway correctly contends that police officers are entitled to use lethal force where the weapon they face is a motor vehicle. *Waterman*, 393 F.3d at 480. Here, Hathaway asserts that he believed that he was about to be run down by the Nissan, and thus he reasonably responded with lethal force to protect his life.

Swann disputes all of Hathaway's arguments. He maintains that Hathaway seized him when Hathaway fired at the Nissan. Additionally, Swann argues that "[n]umerous factual issues exist about whether Hathaway acted reasonably when he fired or whether he had probable (or indeed any) cause to shoot at the car after the car had passed him and did not pose an immediate threat to anyone." (Pl.'s Mem. of Law in Opp. To Hathaway's Mot. Summ. J. 16.)

In light of these arguments, the viability of Swann's § 1983 claim against Hathaway turns on two issues: (1) whether Hathaway seized Swann, and, if so, (2) whether Hathaway's actions were reasonable.

### 1. Did Hathaway Seize Swann?

Hathaway maintains that he did not shoot at or hit Swann. If this is true—if, in fact, Hathaway did not shoot Swann—Swann does not have a viable § 1983 claim against Hathaway because Hathaway would not have "seized" Swann within the meaning of the Fourth Amendment. *Howerton*, 213 F.3d at 173. The record supports Hathaway's position because there is no evidence in the record from which a jury reasonable could conclude, by a preponderance of the evidence, that Hathaway shot Swann.

The ballistics evidence of record shows that Hathaway shot at the Nissan three times. It is undisputed that two of those bullets did not hit Swann. *(See, e.g.,* Hamby Dep. 55:9–21, 139:9–140:2, Oct. 16, 2006.) The path and ultimate resting place of the third bullet remains unclear. This third bullet is the only one that could have hit Swann, and there is no evidence from which a reasonable jury could find, by a preponderance of the evidence, that the third bullet hit Swann. Swann's own expert, Dr. James E. Hamby, concedes that he could not "determine where [it] went or what it hit." (Hamby ¶ 16, Nov. 14, 2006.)

Swann argues that, even though his expert cannot testify to "any degree of scientific certainty" about the path of Hathaway's third bullet, it is a fact question for the jury whether that bullet his Swann. Hathaway, however, observes that Swann can only speculate about the third bullet and whether it hit him. Such speculation, he continues, does not amount to a genuine dispute of material fact. The Court agrees.

As explained above, a party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale*, 769 F.2d at 214. Instead, the party who bears the burden of proof on an issue at trial can survive summary judgment only if he has sufficient evidence from which a reasonable jury could for hi, by a preponderance of the evidence, on that point. *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548.

That is not the case here. Swann can only speculate that Hathaway's third bullet hit him. There is no evidence in the record that supports this line of speculation. A jury, therefore, faced with such a dearth of evidence, could not reasonably conclude that Hathaway shot Swann, as it appears equally likely that Hathaway did not shoot him.

■■■ Swann attempts to salvage the § 1983 excessive force claim against Hathaway by disputing the law in this area and pointing out what he asserts to be a factual incongruity in the record. First, Swann contends, contrary to Fourth Circuit precedent, that when an officer shoots into a moving car, he seizes everyone inside the car. Under this argument, Hathaway seized Swann merely by shooting into the Nissan. Swann supports this proposition by misconstruing *Schultz v. Braga.* In that case, police shot into a truck and hit the passenger, but not the driver. *Schultz,* 455 F.3d at 474. The Fourth Circuit concluded that the driver did *not* have a viable excessive force claim because she was not "seized" within the meaning of the Fourth Amendment. *Id.* at 479 ("The district court ruled that Harkum could not prevail on her claim of excessive force because she was not 'seized' by Agent Braga within the meaning of the Fourth Amendment in the first instance. We agree."). Thus, the controlling precedent in the Fourth Circuit supports the conclusion that only the individuals who are *struck* by the bullets are seized. *Id.*

Second, and in a similar vein, Swann contends that the Supreme Court's recent decision in *Brendlin v. California* "confirms that the shots fired by the officers in this case effected a seizure of Plaintiff, even if the bullets did not strike or otherwise physically injure Plaintiff." (Pl.'s Notice of Supplemental Authority in Opp'n to Mot. Summ. J. 1.) A close reading of

*Brendlin,* however, proves otherwise. *See Brendlin v. California,* 551 U.S. ——, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). In *Brendlin,* the Supreme Court held that, when a police officer makes a traffic stop, both the driver and the passenger are seized within the meaning of the Fourth Amendment. *Id.* The Court made a point of noting, however, that "[a] police officer may make a seizure by a show of authority and without the use of physical force, *but there is no seizure without actual submission;* otherwise, there is at most an attempted seizure as far as the Fourth Amendment is concerned." *Id.* (emphasis added). In the case of a routine traffic stop, for instance, the submission occurs when the police officer "halts the driver, diverting both [the passenger and the driver] from the stream of traffic to the side of the road." The driver and the passenger submit to the police, in effect, when the driver leaves his route and pulls over to the side of the road. In other cases, submission is not so clear or may not occur at all, and, on that point, the Court noted that:

> But what may amount to submission depends on what a person was doing before the show of authority: *a fleeing man is not seized until he is physically overpowered,* but one sitting in a chair may submit to authority by not getting up to run away.

*Id.* (emphasis added).

In this case, application of those precepts establishes that there was no seizure of Swann by Hathaway. In that respect, it is beyond dispute that neither Byrd nor Swann submitted to the police officers present on the scene. To the contrary, they evinced a lack of submission at several key points. To begin, the officers did not pull the Nissan over to the side of the road. They surrounded it only after Swann, whom they had been chasing

through the neighborhood, jumped into its backseat. Swann did not enter the Nissan as a way of submitting to the officers. It is clear from the subsequent actions of both Byrd and Swann that Swann entered the vehicle in an attempt to get away from the officers. Indeed, within a matter of seconds after Swann entered the Nissan, Byrd moved into the driver's seat of the Nissan, put the car into gear, and accelerated, in an attempt to escape the officers.

Additionally, at no point during the foot pursuit of Swann, or the moments before the Nissan accelerated, did Swann or Byrd comply with *any* instructions from the defendant officers. The police officers on the scene shouted a number of commands at them, including "stop," "show us your hands," and "don't move," none of which Swann or Byrd obeyed. In short, therefore, there were absolutely no actions on the part of either Swann or Byrd indicating that they were submitting to police authority. Instead, they actively tried to avoid the police at virtually every part of the encounter. Hence, the decision in *Brendlin* does not alter the existing law respecting seizure on facts such as those present here.

Third, Swann argues that, because Wilson and Hathaway each shot once through the front windshield of the Nissan and it is impossible to determine which of them shot the bullet that hit his shoulder, both Hathaway and Wilson are liable for shooting him under the doctrine of alternative liability. He observes that The Second Restatement of Torts states that, "[w]here the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has *not* caused the harm." Restatement (Second) of Torts § 433B (1965).

While alternative liability is clearly a tort-based principle, both the Fifth and the Tenth Circuits have suggested that alternative liability may apply in certain § 1983 cases. *See Northington v. Marin,* 102 F.3d 1564, 1568 n. 1 (10th Cir.1996)("Marin does not argue that § 433B can never be applied in a § 1983 action, and we conclude the burden-shifting principle of § 433B can apply in a § 1983 action when the facts support it."); *Grandstaff v. City of Borger,* 767 F.2d 161, 168 (5th Cir.1985)("The firestorm that killed James Grandstaff was in all respects a joint operation: the same recklessness, the same circumstances, and the same object. Each participant was as much at fault as the others; and all are liable for the foreseeable consequences."). The Fourth Circuit, however, has not addressed this issue.

The Court, however, need not consider the applicability of alternative liability here because the record does not establish that bullet that hit Swann's shoulder came through the front windshield of the car. In fact, Swann himself testified that the bullet that hit him in the shoulder came from behind him, rather than from in front of him:

Q. What places on your body do you remember bullets hitting you?

A. Like, um, right here. (Indicating.)

Q. Meaning your left shoulder?

A. Left shoulder, right.

Q. Did it hit you in the back or in the front?

A. Yeah. It came from the back of me. Everything came from the back of me.

(Swann Dep. 60:21–61:4, Aug. 3, 2006.) Clearly, Hathaway's shots came from the front of the car, not from behind. Thus, the doctrine of alternative liability could not be the predicate for a claim against

Hathaway even if it were the rule in this circuit.

### 2. If Hathaway Seized Swann, Did Hathaway Act Objectively Reasonably?

 Even if the record did raise a triable issue respecting whether Hathaway shot Swann (and thus seized him), Swann still would have to prove, by a preponderance of the evidence, that Hathaway acted unreasonably in shooting. Hathaway maintains that all of his actions were reasonable. Swann again disputes the law in this area and the implications of the facts in this case.

First, Swann contends that Hathaway's decision to fire at the Nissan was unreasonable because he did not attempt to find cover before shooting. He claims that, before shooting, Hathaway ran "straight past readily-available cover, including a parked van that remained only feet behind him and a large tree that was near the car .... " and that he had enough time to take cover between seeing Byrd move into the driver's seat and the Nissan's acceleration. Swann contends that in similar circumstances, says Swann, courts, including the Fourth Circuit, have held that an officer's failure to take advantage of reasonable alternatives that would have eliminated the need to employ deadly force created issues of fact that required resolution by jury. Swann's reading of these decisions on which he relies does not support that argument.

The first Fourth Circuit decision which Swann cites to support his proposition that Hathaway had an obligation to seek cover is *Drewitt v. Pratt*, 999 F.2d 774, 776 (4th Cir.1993), wherein an off-duty police officer attempting to arrest a driver for reckless driving was hit by the driver's vehicle. In the course of the collision, the officer managed to fire two shots, both of which struck the driver. *Id.* The Fourth Circuit

held that the officer was entitled to qualified immunity. *Id.* at 780. The court noted, however, that "[c]ontrary to the district court's conclusion" it believed "that [the officer's] exact location in connection to [the plaintiff's] vehicle at the time it sped forward [was] relevant" to the issue of whether the officer had probable cause to believe that the plaintiff was posing a threat of death or serious bodily harm to him. *Id.* Swann takes that comment to mean that "an officer's failure to take advantage of reasonable alternatives that would have eliminated the need to employ deadly force" creates a jury issue. That argument misapprehends the facts in *Drewitt* and the significance of the statement because *Drewitt* mentioned nothing about reasonable alternatives or available cover. *See id.* at 774–80. Instead, the Court of Appeals merely stated that the position of an officer is relevant is assessing whether that officer had a reasonable belief that he was facing death or serious bodily harm. *Id.* at 780. That, of course, is both logically correct and legally accurate. However, the decision in *Drewitt* is simply an affirmation of existing Fourth Circuit precedent respecting § 1983 excessive force claims that an officer may use lethal force only if he has a reasonable belief that he is facing death or serious bodily harm. Clearly, the position of the officer is pertinent to that issue. But, contrary to Swann's assertion, *Drewitt* did not establish a new standard requiring officers to take cover before shooting.

The other two decisions which Swann cites are similarly misconstrued. In *Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1144–47 (9th Cir.1996), a plainclothes police officer chased two men whom he believed had just robbed a woman. After the suspects jumped into a car, the officer fired two shots into the car, one of which killed the driver. The case was

submitted to a jury which found that the officer had used excessive force and violated the constitutional rights of the plaintiffs. *Id.* at 1144–45. During the trial, however, the jury was faced with conflicting evidence about whether the car was moving in the direction of the officer before the first shot, how fast the car was moving, and the officer's location at the time of the shots. *Id.* at 1146. On appeal, the Ninth Circuit concluded:

> On the basis of the evidence presented at trial, the jury could have reasonably concluded that a reasonable officer, who had positioned himself facing the driver so that he was standing closer to the side than the dead-center of the car, would have recognized that he could avoid being injured when the car moved slowly, by simply stepping to the side. In short, a juror could have reasonably reached the conclusion at which the jury appears to have arrived: that the car did move prior to [the officer's] shooting [the plaintiff] but that it was moving or rolling sufficiently slowly that a reasonable officer in [the officer's] position would not have perceived himself to be in danger of serious bodily harm.

*Id.* at 1146–47. *Acosta* cannot reasonably be read to stand for the proposition that officers have an affirmative obligation to attempt to find safety before using deadly force. Instead, it stands for the unremarkable proposition that officers cannot use deadly force if they are not faced with death or serious injury.

Swann also cites *Estate of Starks v. Enyart,* 5 F.3d 230, 232 (7th Cir.1993), a Seventh Circuit case, wherein officers chased a suspected car thief into a parking lot. When the suspect attempted to drive off, the officers shot and killed him. The officers claimed that they shot because the car was heading toward one of them. However, the record showed that officer had been behind a utility pole during much of the incident and had stepped out from behind it only after the suspect already had started driving the car at a high rate of speed, thereby placing himself in the path of the moving vehicle. *See id.* On that record, the Court of Appeals affirmed the district court's refusal to grant the officers qualified immunity. *Id.* at 235. The Seventh Circuit observed:

> The key dispute for the factfinder will be whether [the officer] stepped in front of [the plaintiff's] rapidly moving cab, leaving [the plaintiff] no time to brake. If he did, then [the officer] would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him, because the decedent would have been unable to react in order to avoid presenting a deadly threat to [the officer]. On the other hand, if [the officer] was in the path of the car before the car started forward or if the factfinder concludes that [the plaintiff] could have braked but chose not to, then the three defendants reasonably responded to [the plaintiff's] acceleration to [the officer].

*Id.* at 234. Thus, again, Plaintiff's proposition is not supported by the decision on which he relies. Under existing precedent, Hathaway was not required to take advantage of "reasonable alternatives" before employing deadly force if, in fact, the vehicle that Swann was in was moving toward him in a way that threatened him with imminent death or bodily harm, a set of facts that is clearly established by this record.

The evidence here shows that the events following Swann's entry into the Nissan all "happened simultaneously" or at least "happened very quickly." Indeed, Hathaway noted during his deposition:

> Q. How long after he started the car did he put it in gear?

A. It was all simultaneous.

Q. What happened to the car when he put it in gear?

A. He mashed on the gas. Was driving a 3,000–pound bullet right at me.

(Hathaway Dep. 115:11–12.) He also noted:

Q. When you fired for the first time, how far away from you was the car?

A. It was right there. It was right in front of me. I don't know how that weapon wasn't—didn't kill me. I don't. I'll never know. I don't know how that vehicle didn't hit me.

Q. It had already started moving, right?

A. Yes.

Q. And you had already seen Officer Wilson get hit before you fired, right?

A. It all happens—I don't know how many times I have to say this or how to explain it. It happened so quickly. Everything happened so fast. We go detail by detail by detail over the incident, but it all happened simultaneously, it all happened very quickly.

(*Id.* 118:4–119:1.) Thus, Hathaway had neither an affirmative obligation to seek cover nor even enough time to contemplate seeking cover. There is no evidence in the record that would allow a jury finding that Hathaway's actions were unreasonable by virtue of his failure to seek available cover before shooting.

Second, Swann contends that the physical evidence indicates that Hathaway was standing further away from the Nissan than he claims. He argues that, even though Hathaway and Wilson claim that they were standing within touching distance of the Nissan, photographic evidence of the scene "clearly demonstrate[s], if Hathaway and Wilson were truly in that space, then they would have been standing next to a very large tree—a tree that neither of them ever mentioned and which would have prevented Wilson from falling to the ground after he was hit." Swann continues that "[i] n order for Wilson to have been in front of the car and be able to fall to the ground, or even step to the curb, the Altima would have to have been parked more than ten feet away from van ... With that much space available to them, Hathaway and Wilson had no need to fire...." (Pl.'s Br. Opp. Hathaway's Mot. Summ. J. 19.)

Swann has not pointed to any evidence in the record that would indicate that Hathaway was standing further away from the Nissan than he claimed. Swann merely speculates that due to the presence of the tree, Hathaway must have been standing much further away. Speculation on a key point cannot suffice to overcome a motion for summary judgment. Swann must be able to point to evidence in the actual record that supports his argument. That evidence does not exist in this case. In fact, in his deposition, Swann's own expert, Charles Key Sr., appears to have conceded that Hathaway was standing close to the Nissan:

Q. But you don't contest, though, the distance Hathaway was from the front of the Nissan because you don't have really have any basis to? [sic]

A. No, I'm not contesting that.

Q. Okay.

A. I'm not—no, what I'm saying is where they were in relation to the van, not where he was in relation to the Nissan. I have to accept the two to four feet. That's what he's testified to consistently.

(Key Dep. at 126:25–127:9, Oct. 25, 2006.) Thus, there is no evidence that Hathaway was standing far enough away from the vehicle so that it did not pose an imminent danger to him when it started moving. Instead, the evidence suggests that Hathaway was standing a mere two to four feet away when the vehicle began moving.[5]

Third, Swann contends that Hathaway fired at the car after it had passed him, and that those shots were unreasonable because Hathaway was no longer being threatened by the vehicle. Swann observes:

> Here, Hathaway fired three shots, the second and third of which were fired after the car had passed him. Hathaway's second shot struck Byrd in the right calf. Hathaway most likely fired this shot through the front, passenger-side window—a shot that could only have been fired after the car passed him ... At a minimum, genuine issues of material fact exist as to whether it was reasonable for Hathaway to employ deadly force at the time he fired the shot into Byrd's leg. Hathaway, however, fired again, eliminating any question: his third shot hit the rear side of the post between the car's front and rear passenger-side doors. That shot *must* have been fired from the rear of the vehicle after most—if not all—of the car was past Hathaway.

(Pl's Mem. Opp. to Def. Hathaway's Mot. Summ. J. at 21 (citations omitted).) This theory does not pass muster on the record.

According to Swann's own expert, Dr. James E. Hamby, however, the only one of Hathaway's three bullets that could have hit Swann *was shot from the front of the car,* through the windshield. (*See* Decl. of James Hamby at ¶ 16.) Thus, Hathaway's other two bullets, even if they were fired once the car had passed him, are not relevant to Swann's § 1983 claim against Hathaway because they did not strike Swann.[6]

For the foregoing reasons, Hathaway's Motion for Summary Judgment on Swann's § 1983 excessive force claim will be granted. There is no evidence in the record from which a reasonable jury could conclude that Hathaway shot Swann. The Court must find, therefore, that Swann cannot prove that Hathaway seized Swann and, by extension, that Hathaway did not apply excessive force against Swann. Even if a reasonable jury could find that Hathaway shot Swann, however, Swann still would not have a viable § 1983 excessive force claim against Hathaway because Hathaway's actions in shooting at the Nissan were reasonable. Hathaway shot to protect himself from a vehicle that was being driven towards him and another officer, an objectively reasonable action under Fourth Circuit precedent.

### B: Swann's § 1983 Claim Against Mocello

■ Mocello fired four shots at the Nissan. He fired one shot at Byrd and hit him. He fired three shots at Swann and

---

5. Additionally, it is worth noting that, in *Waterman*, the Fourth Circuit found that officers standing as far as 72 feet away from a moving vehicle were facing a deadly threat, even though the vehicle only reached a top speed of 15 miles an hour and "none of the officers were directly in front of Waterman's vehicle." *Waterman*, 393 F.3d at 474–75. Whether Hathaway was standing 3 feet or 15 feet away from the Nissan, therefore, is insignificant. In either case, he was standing di-

rectly in front of a rapidly accelerating vehicle and, thus, his decision to fire was objectively reasonable.

6. One of those bullets did hit Byrd, but that is irrelevant for purposes of § 1983 analysis. As discussed above, only persons hit by the bullets are considered "seized" within the meaning of the Fourth Amendment.

hit him at least twice. Mocello contends that he is entitled to summary judgment on Swann's § 1983 excessive force claim because the facts show that Mocello's conduct at the time he fired his weapon was objectively reasonable:

> In that moment, Detective Mocello heard gunshots and saw glass shattering from the rear windshield of the car. Detective Mocello had also seen Swann run from the police and make repeated furtive movements inside the car between his waist and the floorboard of the car. Detective Mocello knew that Swann had refused to comply with repeated commands from the officers on the scene and knew that Sergeant Pence had observed Swann reaching into his waistband or pocket and had radioed to the Task Force members to use caution. In short, Detective Mocello responded to a perceived threat of imminent harm under circumstances which were "tense, uncertain, and rapidly evolving." *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865.

(Mocello Mot. Summ. J. 19.) Mocello also observes that "Swann's own expert shows that Detective Mocello's perception that shots were coming from the car was not only reasonable, but accurate," noting that "Dr. Hamby confirmed that at least one round exited the rear windshield of the car, corroborating Detective Mocello's testimony that he saw shattering glass coming out from the rear windshield of the car." *Id.*

The testimony of other, non-party, officers at the scene also supports the reasonableness of Mocello's perception of danger from Swann. Detective Edwards, for instance, testified that he did not know whether the shots fired were "coming from the vehicle or other places." (Edwards Dep. 96:3–4, Sept. 21, 2006.) He also noted that he felt threatened by Swann, stating, "I didn't have my gun out and I didn't

have good cover and to me I just felt there was a threat there that could hurt me so I decided to back up from where the vehicle was." *(Id.* 38:1–4). Similarly, Detective Davenport testified during his deposition:

A. As soon as I heard the first gunshot, I drew my gun. I didn't know who was shooting or where the shooting was coming from. My focus, even more intently, went inside that car to see if I was taking fire from the car. I didn't see—all I saw was this figure and the car moving away. I didn't see who was shooting, which direction they were shooting. My concern was, was that car shooting.

Q. You didn't see any shots from the car?

A. I did not.

Q. Why did you assume that shots were coming from the car?

A. The shots were in close proximity to the car. We had just chased somebody. Edwards was getting ready to break out a window. They were telling people to get out of the car. And, then, when I heard gunshots, I assumed that they came from the car.

(Davenport Dep. 64:11–65:8, Sept. 8, 2006.) Mocello's perception that Swann was placing him in danger of death or serious bodily injure, therefore, appears objectively reasonable. Mocello was dealing with a suspect who had wholly failed to comply with any police commands and who had been making movements between his waist and the floor of the car. When faced with shots exiting the rear windshield of the Nissan, therefore, it was objectively reasonable for Mocello to believe that he was being fired at by Swann. Other officers on the scene interpreted the events in the same way.

Mocello's position is based on four Fourth Circuit decisions, each of which addressed how to evaluate the nature and extent of perceived threats facing police officers. In *Greenidge v. Ruffin*, 927 F.2d 789, 790 (4th Cir.1991), the plaintiff alleged that the deadly force used by a police officer in a prostitution arrest was unreasonable and thus in violation of his constitutional rights. The police officer, however, was faced with two people who had failed to comply with her order to place their hands in view. *Id.* The officer also observed one of the individuals "reach for a long cylindrical object from behind the seat" of the car, which the officer believed to be a shotgun. *Id.* The officer fired her weapon as a result, permanently injuring one of the individuals in the car. *Id.* The object turned out to be a wooden nightstick. *Id.* The Fourth Circuit affirmed the judgment of the district court, upholding the verdict for the defendant on all counts, and noting that, although the case was "unfortunate," the officer made a split-second judgment to shoot after seeing the plaintiff reach for an object that looked like a deadly weapon. *Id.* at 793.

Similarly, in *Slattery v. Rizzo*, 939 F.2d 213, 215 (4th Cir.1991), a passenger in a vehicle that had been stopped for traffic infractions ignored an officer's repeated orders to place his hands in view, and then closed his hand around an object that the officer thought was a weapon but which turned out to be a beer bottle. The officer fired at the passenger, hitting him in the face, The Fourth Circuit held that "[w]e believe that under the undisputed facts of this case, a reasonable officer could have had probable cause to believe that the appellee posed a deadly threat and therefore would be authorized to use deadly force." *Id.* at 216–17.

In *McLenagan v. Karnes,* a police officer shot an unarmed arrestee at a sobriety checkpoint. *McLenagan,* 27 F.3d at 1009. After being alerted that an arrestee had gotten hold of a gun, the officer shot the wrong arrestee as he ran out of the building behind an apparently fleeing deputy. *Id.* at 1005. The Fourth Circuit held that, even though the officer did not see a gun in the arrestee's hands (which were handcuffed in front of him at the time), he also "could not confirm that [the arrestee] was unarmed," and had to make a "split-second judgment" in a situation "where inaction could have resulted in death or serious injury to the officer and others." *Id.* at 1007–08. Consequently, the Fourth Circuit concluded that the officer had not used excessive force.

Lastly, Mocello cites *Russell* to support his claim that he was justified in shooting at Swann. In *Russell,* the Fourth Circuit held that an officer's use of deadly force against an unarmed suspect was reasonable because the suspect reached down to his waistband toward a bulge, the appearance of which was consistent with the shape of a gun, but which turned out to be an eyeglass case. *Russell,* 247 F.3d at 132. The Fourth Circuit held that, although the case presented "extremely unfortunate" circumstances, the suspect's actions had "unwittingly caused [the officer] to fear imminent and serious physical harm," thereby justifying the shooting. *Id.*

Mocello argues that "with glass shattering, multiple shots fired and one officer down, the nature and extent of the perceived threat facing Detective Mocello at the time he shot Swann was as compelling, if not more so, than the nature of the threats at issue" in the cases described above. Indeed, in those cases, unlike the one here, "no shots were fired in the vicinity of any of the police officers involved." Thus, Mocello concludes that the Court should find, as a matter of law, that Detective Mocello acted objectively reasonably

in firing his weapon at Swann under the undisputed facts of this case and long-standing Fourth Circuit precedent.

Swann disputes both the law and the facts upon which Mocello relies. He argues that Mocello's own statements, and the statements of the other officers on the scene, establish that Mocello's actions were unreasonable. He also claims that there is conflicting evidence in the record which creates genuine issues of material fact about Mocello's stated justifications for shooting Swann. Also, Swann asserts that, even if these factual issues did not exist, Mocello still could not establish that shooting Swann was objectively reasonable. Each of Swann's primary contentions will be examined in turn.

First, Swann contends that the statements of the officers on the scene create a material issue of fact about what Swann was doing in the backseat of the Nissan. He notes, for instance, that Wilson testified at deposition that he only saw Swann lying down in the backseat. (Wilson Dep. 71:3–13.) Swann fails to note, however, that later in the deposition, Wilson explained that he "couldn't see" what Swann was doing once he got into the Nissan. (Wilson Dep. 94:13–15.) Similarly, Swann points out that Edwards testified at deposition that he only recalled seeing Swann leaning over towards the Nissan's left side. (Edwards Dep. 36:3–7.) Edwards also testified, however, that he "never saw [Swann's] hands the whole time." (Edwards Dep. 89: 15–18). The officers who could see Swann and who actually observed his conduct all testified that he was moving around, particularly between his waist and the floor of the car. (See, e.g., Mocello Dep. 153:17–154:11; Pence Dep. 191:18–192:2.) Thus, on this record, it cannot be said that there is a genuine dispute of material fact as to Swann's movements in the backseat of the Nissan.

Second, Swann argues that Mocello's claim that he heard shots from the car and saw the rear windshield 'shatter' is contradicted by both other officers' accounts and by Mocello's own prior statements. In his deposition, Mocello said that, even though he was standing close enough to touch the Nissan, he did not see anything that would indicate that shots were fired from the inside of the vehicle: no gun, no muzzle flash, no extension of Swann's arm. (See Mocello Dep. 178:1–179:9.) In fact, Swann notes that Mocello even conceded during his deposition that he decided to shoot Swann even though he "couldn't exclude the possibility that the shots were being fired by ... other officers." (Id. 178:14–22.) Swann ignores, however, two facets of existing precedent that make those assertedly disputed facts irrelevant. First, the Fourth Amendment does not requires police officers to wait until a suspect shoots at them to confirm that a serious threat of harm exists. Elliott, 99 F.3d at 644. Second, the Fourth Circuit has rejected the position that a police officer must detect the presence of an object in a suspect's hand before firing. See McLenagan, 27 F.3d at 1007. Hence, those disputed facts are not material.

Third, Swann asserts that there is conflicting evidence about when the Nissan's windshield shattered. In his initial statement to the State Police, Mocello claimed that the rear windshield shattered when the car collided with the tractor trailer truck across the street, after all of the shooting had ceased. According to Swann, it was not until months later that Mocello claimed the shattering glass contributed to his decision to shoot.

Swann, however, appears to be conflating two separate events: (1) the glass breaking as the bullets fired from the front of the car exited through the rear windshield, and (2) the "explosion" of glass as

the windshield fell away from the rear window frame upon the car's impact with the tractor trailer. Pence's observations regarding the condition of the Nissan's rear windshield confirm this critical distinction. Pence, who was best situated to offer evidence on both events, testified at deposition that he saw bullet holes in the rear windshield of the car after it passed him and before the windshield "exploded" when the vehicle hit the tractor trailer. (Pence Dep. 207:6–11.) No witness says otherwise. Additionally, Dr. Hamby, Swann's own expert, testified that at least one bullet fired from the front of the car likely traveled out through the rear windshield. (Hamby Dep. 119:5–11.) Accordingly, there does not appear to be any genuine dispute in the evidence about where the windshield shattered or whether there was a bullet that exited the rear window in Mocello's direction.

Fourth, Swann notes that Alfred Durham, Chief of Staff of the Richmond Police, police procedure expert Charles J. Key, Sr., and the Richmond Commonwealth Attorney's office made statements indicating that Officer Mocello's actions were not reasonable. It is now well-settled that such *post hoc* assessments may not be considered in assessing the reasonableness of Mocello's actions. Crediting these statements would entail judging Mocello's actions with the 20/20 hindsight that is specifically forbidden by the Supreme Court in *Graham,* and the Fourth Circuit *Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir.1996). *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865. As Mocello notes, "[w]hile hindsight may now show that Swann did not present any actual threat of harm to Detective Mocello from a gun, Detective Mocello was not 'afforded the luxury of armchair reflection' to decide how to respond to the perceived threat of harm or to consider whether the shots were fired by other officers on the scene." Instead, "[i]n the midst of shattering glass and multiple shots fired, Detective Mocello was faced with 'an impossible choice that had to be decided in the flickering of an instant,'" and decided to fire at Swann as an act of self-protection. Additionally, as Mocello correctly observes, the issue in this case is "whether Detective Mocello breached some Constitutional or civil duty owed to Swann, not whether he violated an internal police regulation or criminal statute."

Fifth, Swann argues that his failure to raise his hands did not make him threatening to Mocello because Swann was faced with the "conflicting commands that the officers on the scene gave the occupants of the vehicle." In his deposition, for instance, Mocello admits that he told the occupants of the vehicle to both "show me their hands" and "to stop moving." (Mocello Dep. 164:15–16.) Officer Wilson heard another officer tell the occupants to "get out of the car." (Wilson Dep. 78:10–12.) Swann contends that, faced with the evidence of these conflicting commands, a jury "could infer that what Mocello saw as 'non-compliance' was merely Swann trying to comply with the command of another officer." Further, Swan argues that "[a] reasonable jury could also conclude that what Mocello saw as 'furtive movements' were Swann's confused reactions to these conflicting commands." Swann neglects to mention, however, that he himself testified during his deposition that he could not hear any commands from the police once he was inside the car, and that all he could hear was "banging on the window." (Swann Dep. 105:22–106:10.) Thus, contrary to Swann's contentions, a reasonable jury would not be able to conclude that Swann's movements inside the car were the result of confusion about how to deal with conflicting commands from the police officers at the scene. And, in any event, it

is Mocello's perceptions of Swann's undisputedly active conduct, not why Swann engaged in that conduct, that is important in assessing the reasonableness of Mocello's actions.

For these reasons, the Court grants Mocello's Motion for Summary Judgment on Swann's § 1983 excessive force claim. Swann's refusal to comply with the officers' orders, his furtive movements in the backseat of the car, and the bullets exiting the vehicle from the rear windshield, all make objectively reasonable Mocello's perception that Swann was shooting at him. Though the subsequent investigation revealed that Swann was unarmed at the time, Swann's furtive movements gave Mocello a reasonable belief that Swann may have been armed, which is all that is required under Fourth Circuit precedent. *See, e.g., McLenagan,* 27 F.3d at 1007 (An officer is not required "to actually detect the presence of an object in a suspect's hands before firing on him," if he or she otherwise has a reasonable belief that the suspect may be armed); *Russell,* 247 F.3d at 132 (The Fourth Amendment "does not require omniscience ... Officers need not be absolutely sure ... of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection.").

Although it is highly unfortunate that Swann was shot, Mocello was forced to make a split-second decision at a moment when pausing to reflect upon his options could have cost him his life. This makes this case similar to *McLenagan,* where the police officer shot the wrong arrestee. In that case, the victim was not only not armed, but also had his hands handcuffed in front of him when the officer shot him. *McLenagan,* 27 F.3d at 1007–08. Even there, the Fourth Circuit ruled in favor of the officer, noting that he had to make a

"split-second judgment" in a situation "where inaction could have resulted in death or serious injury to the officers and others." *Id.* In this case, it was even less clear that the suspect was not armed. Swann was in the backseat of the vehicle with his hands down towards his waist or near the floor. Two of the officers could not see his hands at all. He also had led the officers on a foot chase and had refused to comply with any of their commands. Thus, when the shooting began and a bullet exited the rear window while the car was moving, Mocello's perception that Swann (rather than the driver of the moving car) was shooting was objectively reasonable.

### C: Swann's § 1983 Claim Against Wilson

Wilson was struck and knocked down by the Nissan when Byrd attempted to drive away. Immediately thereafter, Wilson fired two shots at the moving Nissan. Wilson contends that he is entitled to summary judgment on Swann's § 1983 excessive force claim because, Wilson claims, the facts establish that Detective Wilson exercised discretion, judgment and restraint in pursuing Swann and in firing upon Byrd. Wilson claims that he "went above and beyond the requirements of the Fourth Amendment by relying upon verbal communication and commands until the last possible moment before being struck, and essentially 'waiting' to be run over by the Altima before firing." Wilson also maintains that he did not shoot Swann. He notes, however, that, even if he did shoot Swann, he was legally justified in doing so because he reasonably believed that he, and his fellow officers, were in danger of death or serious bodily injury.

Like Swann's § 1983 claim against Hathaway, the viability of Swann's § 1983 claim against Wilson depends on whether Wilson shot Swann and, if so, whether

Wilson's actions were objectively reasonable.

### 1. Did Wilson Seize Swann?

Wilson contends that he did not shoot Swann. He contends that the forensics reports in the record do not link any of Detective Wilson's bullets to Swann and that Swann does not have any evidence to the contrary. Accordingly, says Wilson, he argues, he did not seize Swann within the meaning of the Fourth Amendment, and thus Swann does not have a viable § 1983 claim against him.

Swann argues, to the contrary, that "competent evidence shows that Wilson intentionally shot at, and hit, Dwayne Swann." Swann makes several arguments to support this claim. First, he argues that "the evidence plainly establishes" that Wilson shot at Swann at least twice. He also notes that Wilson has admitted that he was aiming for Swann. On the night of the shooting, for instance, Wilson told Special Agent Kaschak that he "fired one shot at the subject in the back seat of the vehicle" because he "thought the subject in the back seat was shooting at them." *(See* Kaschak Summ. of Feb. 4, 2004 Interview of Wilson 2.)

Second, Swann argues that evidence in the record establishes that Wilson actually shot Swann, thus seizing him within the meaning of the Fourth Amendment. The contention is that:

Of the nine bullets fired that night, five hit Swann. Mocello unquestionably caused two of these wounds, leaving three unaccounted-for wounds ... By process of elimination, there is no question that Wilson caused at least one such wound. Four of the nine fired bullets unquestionably did not hit Swann: (1) the bullet that hit Byrd (which was fired by Hathaway), (2) the bullet that lodged in the armrest of the driver's door after

passing through the windshield (which was fired by Wilson or Hathaway); (3) the bullet that lodged in the passenger-side door post (which was fired by Hathaway); and (4) the bullet lodged in the rear passenger tire (which was likely fired by Mocello) ... Thus, three bullets remain unaccounted for, all of which *must* have hit Swann: (1) the bullet fired through the passenger side front windshield, which caused Swann's shoulder wound (which was fired by Hathaway or Wilson); (2) the bullet fired through the rear passenger door (which was fired by Wilson); and (3) a bullet that entered the car from an unknown location ... As this evidence shows, Wilson fired at least one shot that hit Swann.

(Pl.'s Mem. Opp. to Def. Wilson's M. Summ. J. 15–16 (internal citations omitted)). Thus, Swann concludes that, taken in the light most favorable to him, the facts plainly show that Wilson aimed at Swann and shot him. That, however, is not the end of the analysis.

Wilson shot at the vehicle twice. Swann's own expert, however, cannot determine whether either bullet hit Swann. *See* Hamby Decl. ¶ 17. As to the first of those bullets, Dr. James E. Hamby stated: "I cannot determine, based on the scientific evidence currently available to me, whether this bullet struck Mr. Swann." *Id.* As to the second bullet, Dr. Hamby averred: "nor can I determine where Officer Wilson's remaining shot went or hit." *Id.* Even if the Court were to accept Swann's argument that, by process of elimination, one of those bullets *must* have hit Swann, the Court would get no closer to resolving the central issues of this claim because: the success of Swann's § 1983 claim against Wilson revolves around *which* of Wilson's two bullets, if either, hit Swann. There are two possible scenarios.

One of Wilson's two bullets appears to have been was fired while Wilson was still in front of the car. Hamby Decl. ¶ 17(b). According to Hamby, that bullet traveled through the front windshield of the Nissan. *Id.* Wilson testified that he was aiming for Byrd when he made that shot. (Wilson Dep. 108:2–111:19.) No evidence refutes that testimony. If Swann was hit by this first shot, he does not have a viable § 1983 excessive force claim against Wilson because Wilson did not "seize" him within the meaning of the Fourth Amendment. On this record, the Court would have to consider Swann an innocent bystander because Wilson was not aiming at him at the time. *Milstead,* 243 F.3d at 163; *Rucker,* 946 F.2d at 281. And, as explained above, if Swann was an innocent bystander, he has no viable excessive force claim even if he was hit by the first shot, which was aimed at Byrd.

Wilson's second bullet appears to have been shot either as the car was passing Wilson, or very shortly after it had passed him. If Wilson was aiming for Byrd when making this second shot, the resolution of the issue would be the same. Wilson and the other officers would still have been in danger from the vehicle at the time, so if Swann was hit accidentally by the second shot in the midst of the volatile situation, he would have been an innocent bystander.

If, however, Wilson was aiming for Swann (as Swann claims), the Court would have to assess whether Wilson's actions were objectively reasonable. For Swann to have even a *viable* § 1983 claim against Wilson, he must be able to prove, by a preponderance of the evidence, that: (a) Wilson shot Swann; (b) the bullet that hit Swann was fired once the car had gone past Wilson; and (c) Wilson was aiming for Swann at the time. If any one of those factors cannot be proven, Swann's claim necessarily fails. As it stands, however,

the only evidence that Swann can offer now is the speculation of Dr. Key and Dr. Hamby that it is *theoretically possible* that one of Wilson's two bullets struck Swann. That is insufficient to establish the seizure component of the § 1983 claim.

## 2. If Wilson Seized Swann, Did Wilson Act Objectively Reasonably?

█ If, however, the Court were to accept Swann's assertions that, taken in the light most favorable to him, the evidence permits the inference that Wilson shot Swann, it is then necessary to determine whether the evidence, interpreted in the light most favorable to Swann, demonstrates that Wilson acted objectively reasonably in shooting Swann. The Court finds that it does.

Wilson shot at Swann because he believed that Swann was shooting at him. On the night of the shooting, for instance, Wilson told Special Agent Kaschak that he "fired one shot at the subject in the back seat of the vehicle" because he "thought the subject in the back seat was shooting at them." (Kaschak Summ. 2.) Wilson also made similar comments during his subsequent interview with Internal Affairs:

Nacy: Let me, let me make sure I got it right when you actually shot at him were there shots, you had heard shots prior to that or that's when you thought they was shooting at you?

Wilson: Yeah, yeah after he, after he hit me I heard a shot when I went down.

Nacy: Okay.

Wilson: After he hit me so I'm thinking man this guy done hit me with the car, and the guy in the back is shooting too you know and that's when I turned around I got a sight on him and the car

was pulling away that's why I only got one shot out because I couldn't shoot quick enough.

(Nacy & Caldwell Oct. 5, 2004 Interview of Wilson 19.)[7] This perception was objectively reasonable. Wilson had just been struck and injured by the vehicle that Byrd was driving. With bullets flying, the possibility that those bullets were coming from inside the Nissan, an accelerating vehicle that had just hit him, and other officers standing nearby, Wilson was forced to make a split-second decision about his own protection and the protection of his fellow officers. He fired once at Byrd, who had struck him with the Nissan, and (we are now assuming) once at Swann, who Wilson thought was shooting out of the car, and who had utterly failed to comply with police commands up to that point. It is true, as Swann argues, that, before having to act, Wilson, "could not see" what Swann was doing in the backseat of the Nissan, and thus could not verify that Swann was not shooting, but, as explained, the Fourth Circuit does not require such verification. Wilson Dep. 94:13–15; *McLenagan*, 27 F.3d at 1007–08. In light of all of these circumstances, therefore, Wilson's decision to fire at Swann was objectively unreasonable.

Swann also argues that Wilson continued to shoot at the Nissan after he, and the rest of the officers on the scene, were no longer in danger. On this argument, Swann points to changes that Wilson made to his deposition on an errata sheet. There, Wilson changes his original testimony from "I stopped firing once I was hit" to "I stopped firing when the car hit the tractor trailer." *(Compare* Wilson Dep. 127:13–14 to 172:18–19.) The ballistics evidence from Swann's own expert, however, indicates that only one of Wilson's two shots could have come from behind the Nissan. Wilson's first bullet traveled through the Nissan's front windshield, necessarily establishing that it had to have been shot from the front of the car. The second bullet traveled through the passenger-side rear door of the Nissan, establishing that Wilson had to be positioned somewhat behind the front of the moving car when he made that shot. This does not, however, mean, as Swann argues, that Wilson fired after he and his fellow officers were out of danger. Indeed, if Wilson thought that Swann was firing at the officers from the back of the Nissan, Wilson still had an objectively reasonable perception of danger as the Nissan was passing him or after it had passed him. Thus, Wilson's change to his deposition has no impact on the proper analysis of Wilson's motion for summary judgment.

For the foregoing reasons, Wilson's Motion for Summary Judgment on Swann's § 1983 excessive force claim will be grant-

---

7. Swann argues that Wilson's justification for shooting Swann is unavailing because Wilson made contradictory statements about this matter. During Wilson's deposition, for example, the following exchange took place:

Q. Is there any reason you would have fired at the passenger in the backseat of the vehicle?

A. No way that I would have fired at him unless he was firing at me.

Q. You didn't see him fire at you, did you?

A. He didn't fire at me.

(Wilson Dep. 119:22–120:7.) Swann misinterprets this testimony. Wilson is not admitting that he did not think that Swann was firing at him from inside the Nissan. Instead, he is making two separate points: (1) he would only have shot at Swann if he thought Swann was firing at him, and (2) Swann did not, in fact, fire at him from inside the Nissan. This does not mean that, however, that Wilson's *perception* that Swann was shooting at him was unreasonable. To the contrary, more than one officer on the scene that night thought the same thing. (Davenport Dep. 64:11–65:8.)

ed. The evidence, taken in the light most favorable to Swann, demonstrates that, even if Wilson did shoot Swann (an assertion that appears impossible to prove by a preponderance of the evidence), his actions were objectively reasonable. Wilson shot at Swann because he believed that Swann was firing at him from the back of the Nissan.

### D: Qualified Immunity

Having found that Hathaway, Mocello, and Wilson cannot be held liable under § 1983 either because either they did not seize Swann or because they acted objectively reasonably, it is not necessary to consider whether they are entitled to qualified immunity. *See Pittman v. Nelms,* 87 F.3d 116, 119 (4th Cir.1996) ("Only if the defendant did act illegally must the case proceed to the second level to determine whether he is, nevertheless, immune from suit").

### V. Swann's Remaining Claims

It is necessary to consider Swann's remaining claims against each of the three officers: assault, battery, gross negligence, and intentional infliction of emotional distress.

*Assault:* Swann alleges that Hathaway, Mocello, and Wilson shot Swann with the intent to cause harmful contact with him, creating in Swann's mind a reasonable apprehension of imminent contact. Swann also alleges in the complaint, but does not specify how, the defendants continued to assault him after they stopped shooting.[8] As discussed above, however, all three defendants acted objectively reasonably, and in their own self defense, when they shot at the Nissan. The Court, therefore, grants all three defendants' motions for summary judgment on Swann's assault claims.

*Battery:* Swann alleges that the defendants committed the common law tort of battery by shooting Swann and by removing him from the Nissan after the shooting. Again, however, the Court finds that the defendants were acting objectively reasonably and in their own self defense when they shot at Swann, and, by extension, when they arrested him. Thus, the Court grants the defendants' motions for summary judgment on Swann's battery claims, as well.

*Intentional Infliction of Emotional Distress:* For the same reasons, the Court grants the defendants' motions for summary judgment on Swann's intentional infliction of emotional distress claims. The defendants were acting not with an intention to inflict emotional harm, but with an intention to defend themselves from what they reasonable perceived to be a danger of death or serious bodily injury.

*Gross Negligence:* Lastly, the Court grants the defendants' motions for the summary judgment on Swann's gross negligence claims. As explained, each of the defendants acted objectively reasonably, and in their own self defense, when they shot at the Nissan. Thus, as a matter of law, Swann cannot establish that they acted with gross negligence.

### CONCLUSION

For the foregoing reasons, Defendant Kevin Paul Hathaway's Motion for Summary Judgment (Docket No. 84), Defendant James Earl Wilson's Motion for Summary Judgment (Docket No. 86), and Defendant Michael Sean Mocello's Motion for Summary Judgment (Docket No. 88) will be granted, and the actions against all

---

**8.** However, that conclusory assertion is not developed beyond the opening pleading and hence cannot be the basis for avoiding summary judgment.

three defendants will be dismissed with prejudice.

An appropriate order shall issue.